Filed 3/2/22  P. v. Scott CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARQUS SCOTT et al., <br><br> Defendants and Appellants. | B301478 <br><br> (Los Angeles County <br> Super. Ct. No. BA448436-01–03) |

APPEAL from judgments of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed in part, vacated in part, and remanded for further proceedings.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Marqus Scott.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant William Saulsberry.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant Wesley Saulsberry.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Marqus Scott, William Saulsberry, and Wesley Saulsberry were convicted of various crimes arising out of incidents in 2015 and 2016.[1] William and Scott were tried together; Wesley was tried separately. All three appeal on multiple grounds. We conclude that recent amendments to Penal Code[2] section 186.22 require us to vacate the gang enhancement findings (§ 186.22, subds. (b)(1)(A) and (b)(1)(C)); the gang-related special circumstance findings (§ 190.2, subd. (a)(22)); and the firearms enhancement findings under section 12022.53, subdivision (e)(1). We remand these issues to the trial court for retrial. In all other respects, the judgments are affirmed.

**FACTUAL AND PROCEDURAL BACKGROUND**

I.    *Charges in the Second Amended Information*

Each defendant was charged with felonies committed individually and with another defendant. The second amended information contained 14 counts. There was no count 3.

In count 1, William and Scott were charged with the murder of Bradford Smith (§ 187, subd. (a)) with the special circumstance that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle at another person outside the vehicle with the intent to cause death (§ 190.2, subd. (a)(21).[3] Gang and firearm allegations were also alleged.

---

[1]    Because brothers William and Wesley Saulsberry share a surname, we will refer to them by their first names for clarity.

[2]    All further statutory references are to the Penal Code unless otherwise indicated.

[3]    In this section, we omit reference to the gang and firearm allegations and special circumstances which must be vacated as they are fully discussed in Section X, below.

2

Count 2 charged William and Scott with the attempted murder of Trannisha Bay (§§ 664/187, subd. (a)), also with firearm and gang enhancement allegations.

In Count 4, William and Wesley were charged with the murder of Eugene Foxworth, again with gang enhancement allegations. As to both William and Wesley, it was alleged that the murder was committed during a robbery. (§ 190.2, subd. (a)(17(A))). Firearm allegations were charged as to Wesley.

As to William, additional special circumstances were alleged, to wit, that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle at another person outside the vehicle with the intent to cause death and multiple murders (§ 190.2, subds. (a)(21), (a)(3)). Gang special circumstances and firearm allegations were also charged.

Counts 5, 8, 13, and 14 charged William with possession of a firearm by a felon (§ 29800, subd. (a)(1)) with gang allegations.

Counts 6 and 7 charged William with the attempted murder and second degree robbery of Andre Prince with gang and firearm allegations.

Counts 9 and 12 charged Scott with unlawful firearm activity (§ 29820, subd. (b)) and gang allegations.

Counts 10 and 11 charged William with the second degree robberies of Andre Berto and Benjamin Yang, both with gang and firearm allegations.

In count 15, Wesley was charged with the second degree robbery of Foxworth, again with gang and firearm enhancement allegations.

In sum, Scott was charged with the murder of Bradford Smith; the attempted murder of Tanisha Bay; and unlawful firearm activity. William was charged with the murder of

3

Bradford Smith; the attempted murder of Tanisha Bay; the murder and robbery of Eugene Foxworth; the attempted murder and robbery of Andre Prince; the robberies of Andre Berto and Benjamin Yang; and possession of a firearm by a felon. Wesley was charged with the murder and robbery of Eugene Foxworth.

Both William and Scott were alleged to be subject to the enhanced sentencing provisions of the "Three Strikes" law (§§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)) because they had prior serious and/or violent crime convictions; and, in William's case, also because he was alleged to have used or been armed with a firearm, or to have intended to cause great bodily injury in the commission of the charged offenses. William was also alleged to have multiple prior convictions of serious felonies and prior convictions and prison terms for the purposes of sections 667, subdivision (a)(1) and 667.5, subdivision (b). Finally, it was alleged as to counts 1, 2, 6, 7, 8, 10, 11, 13, and 14 that William was released from custody on bail or on his own recognizance at the time he committed the charged crimes (§ 12022.1).

All defendants were tried by jury. The People elected not to seek the death penalty.

II. *Wesley's Trial*

At Wesley's request, and without opposition by the People, Wesley was tried separately, and his trial took place first. The two charges against Wesley arose from a single incident involving Wesley, William, and the victim, Eugene Foxworth.

A. <u>Evidence at Trial</u>

On August 18, 2015, Junior Davis and his friend Foxworth were at a casino when Davis received a text message from Miguel Mitchell, whom he knew as "V." Davis had previously acted as a

4

middleman for Mitchell's drug transactions. Mitchell texted Davis that he (Mitchell) knew someone who wanted to sell oxycodone pills. Davis told Foxworth about the pills, and Foxworth wanted to buy them.

Davis and Mitchell agreed the deal would take place in the casino parking lot. Foxworth left the casino and returned with cash for the transaction. Mitchell arrived and told Davis his friends with the pills were at a nearby shopping plaza. Foxworth drove his Jaguar to the shopping plaza, and Davis rode with Mitchell in Mitchell's car. Due to a police presence in the plaza, the location for the transaction was changed to a gas station.

Foxworth and Mitchell arrived at the gas station in their respective vehicles, followed by a black Prius. Surveillance video showed the three cars arriving. Mitchell told Davis the two men in the Prius had the pills, and Davis told Mitchell to go get the pills from them so Davis could bring them to Foxworth. Mitchell spoke to the men in the Prius but returned empty-handed, reporting the men did not trust him with the drugs.

As reflected on the surveillance video, Davis approached the Prius himself. He could see Wesley in the driver's seat and William in the rear seat. Davis urged the men to complete the transaction quickly, and William asked Davis if he had the money. Davis said he did not, and William said he wanted to speak with the man with the money.

Davis returned to Foxworth and suggested they leave because the men were playing games. Instead, Foxworth put his money in the large pockets of his pants, walked to the Prius with Davis, and told Davis to watch out for police. Foxworth walked around the car and got in the backseat with William.

Davis was watching for police when he heard Foxworth yell, "Are you guys gonna rob me?" Davis looked toward the Prius and saw Wesley struggling with Foxworth over the money. Foxworth punched Wesley as Wesley tried to grab the cash. Foxworth tried to exit the car but Wesley pulled him back. Surveillance video showed Foxworth being pulled back into the car.

Foxworth managed to extricate himself at least partially from the car as Wesley grabbed at him. Foxworth put his hands in the air and then William shot him. Foxworth took a few steps, told Davis he had been shot, and collapsed. Foxworth died from a gunshot wound to his abdomen.

Mitchell called Davis an hour later and told Davis the men from the Prius wanted to talk with him. Fearing the men would kill him because he had witnessed the shooting, Davis said he was leaving town.

Three days later, on August 21, 2015, Davis heard noise outside his apartment early in the morning. He looked through the peephole and saw Mitchell and two other men. Davis believed the men were Wesley and William, but he could not see them plainly. The men left when neighbors came out of their apartments.

That day, Davis went to the police and told Detective Gabriel De La Torre and Detective Kevin Lane what he had observed. He identified Mitchell from a photographic lineup.

Approximately one month later, De La Torre learned that William and Wesley might have been involved in the Foxworth shooting. Lane assembled three photographic lineups. One contained Wesley's photograph, and another contained William's photograph.

De La Torre and Lane showed the photographic lineups to Davis on September 29, 2015. Davis quickly identified William as the shooter but was unable to positively identify anyone from the other two lineups. When looking at the lineup that contained Wesley's photograph, Davis tentatively pointed to another photograph and said that the person in that photograph looked similar to the driver. This interview was recorded, but the recording was subsequently lost.

At the preliminary hearing in April 2017, Davis identified Wesley as the driver of the Prius and William as the shooter. Davis was afraid to identify William and Wesley because Mitchell had told him they were gang members.

At trial, Davis testified that the photographs of Wesley and the other person both looked like the driver. The other man Davis was looking at had died before the Foxworth shooting.

Shortly before Davis was subpoenaed to testify at trial, he received two threatening text messages that increased his fear. The parties stipulated that neither William nor Wesley had any involvement in the texts, and the jury was so advised. The jury was also advised that the texts could only be considered insofar as they impacted Davis's credibility.

DNA recovered from Foxworth's fingernails contained a mixture of his DNA with that of another person. Laboratory testing ruled out William as the contributor of the other DNA but did not exclude Wesley. A criminalist testified that only one in 5.5 trillion people would have a DNA profile that could not be excluded as the source of that contribution.

In October 2015, police recovered a cell phone that William tossed away as he was being pursued by police for an unrelated offense. Another phone was recovered from the seat in which William had been sitting when police arrested him in March 2016. Both cell phones used the same telephone number. Cell tower records showed a phone with that telephone number was in the approximate area of the shooting at the time it occurred.

Wesley rested without presenting evidence.

B.    Verdict and Sentence

Wesley was found guilty of the second degree robbery and the first degree murder of Foxworth (counts 4 and 15). The jury found true the special circumstance that the murder was committed while Wesley was engaged in committing a robbery (§ 190.2, subd. (a)(17)(A)).

The trial court sentenced Wesley to life imprisonment without the possibility of parole for the murder of Foxworth. For the robbery, Wesley was sentenced to three years in prison, consecutive to the sentence for the murder. (We again defer discussion of the gang and firearm allegations, findings, and sentences to Section X.) Wesley appeals.

III.    *Scott and William's Trial*

Scott moved to bifurcate his trial from William's, to seat a second jury to try only the crimes associated with him, or to have a single jury decide the charges involving both defendants before the charges against William alone. The court denied the motion without prejudice.

Prior to trial, Scott moved to exclude evidence of videos on his phone depicting him rapping about a shooting. The court denied the motion.

8

A.    Prosecution Evidence

1.    **Shooting of Foxworth (William only)**

The evidence presented by the People at Scott and William's trial tracked the evidence presented at Wesley' trial.

As set out above, at the end of the scuffle between Wesley and Foxworth, Davis saw Foxworth outside the Prius with his hands up in the air. Moments later, William shot Foxworth. Foxworth died from a gunshot wound to the abdomen.

In October 2015, William tossed away a cell phone while being chased by police. The phone contained photographs of William, including one showing him in possession of a Glock handgun. Cell tower records indicated that, at the time of the Foxworth shooting, this phone had been in the vicinity of the gas station where Foxworth was shot. The cell tower records for the phone corresponded with Davis's testimony about the locations the Prius had driven at the time.

2.    **Robbery of Andre Berto (William only)**

At approximately 2:45 p.m. on December 9, 2015, Andre Berto was seated in the driver's seat of his Rolls Royce in West Hollywood when a black Infiniti SUV pulled up behind him. A black man wearing a mask and carrying a Glock handgun exited the Infiniti and banged on the driver's side window of Berto's car. The man took Berto's bracelet and Rolex Sky Dweller watch. The watch was worth between $50,000 and $60,000. The assailant returned to the SUV and left the area.

Detective Gregg Fischer searched the apartment of William's girlfriend, Kristina Pringle, where they found documents demonstrating the couple's relationship. The detective also found numerous cell phones, including one that

9

had selfie photographs of William and photographs of a Rolex Sky Dweller watch that matched Berto's watch. The data for the photograph of the Rolex indicated the photograph had been taken on December 9, 2015, at 2:54 p.m.

On December 8, 2015, Pringle's grandmother had rented an Infiniti SUV for Pringle to drive.

### 3.     Robbery of Ben Yang (William only)

On December 22, 2015, Ben Yang was driving in West Hollywood. At a red light, a man with a black semiautomatic handgun approached the passenger side of Yang's car and instructed Yang to lower his window. The man was wearing a hoodie and a bandana, but Yang could see that the man was Dominican, Puerto Rican, or Black. He could not see the man's face.

At the man's demand, Yang handed over his Audemars Piguet Royal Oak Chronograph watch in rose gold. The rare watch, one of only approximately 5,000 worldwide, was worth approximately $50,000. The man walked away and left in a black Infiniti SUV with dealer plates. Yang called 911 and followed the Infiniti, but he discontinued his pursuit when the chase became too dangerous. Yang stopped pursuing the SUV near the intersection of Melrose and Doheny.

Anna German was near the Beverly Center at the time of the robbery. At the intersection of Third Street and San Vicente, her Ford Explorer was struck by a black SUV. The driver of the SUV drove away without stopping, but German retrieved the license plate and holder that fell off the SUV during the collision and gave them to the police. The license plate belonged to the Infiniti SUV rented by Pringle's grandmother for Pringle on December 8, 2015. Pringle had the Infiniti on December 22,

2015. After being reported stolen, the Infiniti was recovered the following day, December 23, 2015.

Information from a cell phone connected to William and recovered from Pringle's apartment demonstrated the phone had been used in an attempt to sell Yang's watch the day after the robbery. A video on the phone showed a watch that looked to Yang like his watch, and there were probably less than 20 of those watches in California. Texts on the phone specifically mentioned Yang's nickname and encouraged a potential buyer to look on social media. The potential buyer asked the seller to send a photograph of the watch, and the seller responded he had done so. Negotiations fell through because the potential buyer and seller could not agree on a price. The potential buyer's name was then removed from the phone's list of contacts.

4.  **Possession of a Firearm (Scott only)**

On February 1, 2016, police officers spotted three men in a vehicle that had been reported stolen. Scott was in the driver's seat. Officers found a loaded, unregistered Glock semiautomatic handgun inside an empty pizza box in the car. The gun was within reach of the driver's seat. Scott was wearing an empty holster that would accommodate the handgun. Neither of the other men in the vehicle possessed items connecting them to the gun.

5.  **Robbery and Attempted Murder of Andre Prince (William only)**

Andre Prince was driving his Rolls Royce with bullet-resistant windows on February 14, 2016, when a black minivan pulled in front of him. A man with a handgun jumped out and banged on the window of Prince's car, demanding that Prince

11

open the door and hand over his "stuff."  When Prince did not comply, the man fired into the glass, then used the butt end of the revolver to smash the window.  Prince opened the door and grabbed the handgun.  He struggled with the gunman and sustained a gunshot wound to his hand, ultimately falling to the ground.  At that point, a second gunman fired multiple rounds at Prince, striking him in the legs and stomach.  Prince sustained seven gunshot wounds.  The two men took money and necklaces from Prince before leaving the scene.

Officer Lesley Perkins was conducting a traffic stop when a person in a car stopped to tell her there had been a shooting.  A few seconds later, Perkins observed a black minivan with the license plate 7MWE179 traveling at high rate of speed.  Perkins locked eyes with the driver as the minivan approached 25 to 30 feet away from her.  Perkins saw that William was driving the minivan.  She read out the license plate number for the minivan so she could remember it and so it would be recorded on her patrol car's audio system.  Perkins pursued the minivan but lost track of it.  The minivan had been rented by Pringle on February 2, 2016.

Perkins proceeded to the location of the shooting, where she observed Prince's Rolls Royce parked at a strange angle with the driver's side door open.  She saw gold jewelry, a wallet, and a cell phone on the ground near the car.  Neither the wallet nor the phone belonged to Prince.  The cell phone recovered at the scene contained selfie photographs of William.

The wallet contained identification for Naypone Gaines, whom Perkins soon learned had arrived at a local hospital with a gunshot wound.  Scott had taken Gaines to the hospital.  Perkins notified the hospital that Gaines was a suspect, not a victim.

12

On March 10, 2016, Perkins identified William from a photographic lineup as the minivan driver.

### 6. Murder of Bradford Smith (William and Scott)

On March 6, 2016, at William's request, Andre McCoy went with Pringle to a rental car office and rented a four-door Dodge Ram pickup truck. McCoy drove the rented truck to his home, and Pringle drove McCoy's car back for him. McCoy gave William the keys to the truck.

On March 14, 2016, William drove the Dodge truck to McCoy's home with Scott as his passenger. William gave McCoy money to extend the truck rental, which McCoy then did. William left McCoy's house at approximately noon.

That evening at about 6:45 p.m., Trannisha Bay sat in her parked car on Adams Boulevard while Bradford Smith worked on the engine. Smith was a member of the Rolling 20's gang, Bay was a member of a different Blood gang called the Van Ness Gangsters, and they were in an area claimed as Rolling 20's territory. Smith was wearing a black "T" Texas Rangers hat, a t-shirt, and jeans. Texas Rangers hats were commonly worn by Rolling 20's gang members.

Bay heard gunshots coming from the street, glanced up, saw a truck, and dove into the backseat of her car. She heard overlapping gunshots and rapid fire, leading her to believe there were multiple shooters. Bay did not know if the shooters fired from the car or left the car to fire, but she did not recall hearing car doors open or close. At least nine rounds were fired. Smith was shot in the head and died at the scene.

13

Monica Velasquez was walking on Adams Boulevard at about 6:45 p.m. when she heard at least six shots fired in rapid succession, then saw a four-door Dodge Ram driving quickly away. It was the only car in the area when the shots were fired. Velasquez saw three Black men in the truck. The passengers wore masks, but the driver did not. She did not hear the truck's doors open or close. Velasquez called 911 and reported the suspects drove away in a Ram truck.

Although no surveillance cameras recorded the shooting itself, they captured images of a four-door Dodge Ram with a paper license plate driving in the area around the time of the shooting. Just before the shooting the Ram was headed west on Adams; it then made a U-turn and drove toward the area where Smith was shot. Then, immediately after the shooting, the Ram turned onto Dalton Avenue and sped away. Velasquez identified the Ram in the footage as the truck she had seen. McCoy also identified the Ram in the footage as looking like the one he had rented for William.

According to cell tower activity records, phones connected to Scott and William were near each other and in the area of the Smith shooting just prior to the shooting at 6:45 p.m. Both phones used cell towers east of the shooting site prior to the shooting, south of the location after the shooting, and then in Inglewood before ending up using cell towers in Orange County that night.

The internet search history on Scott's phone included a search from the day after the shooting for "man shot in the head Adams." A screenshot of an article about the Smith shooting was saved on the phone. Notes from two days before the shooting referred to catching Blood gang members not paying attention in

their neighborhood.  Additionally, the phone contained videos of Scott rapping the day after the Smith shooting.  Scott rapped, "Fuck a stain on bullet gang, and T hats. [¶] I whack those every time I see that. [¶] Bullet gang, you ain't want know feedback. [¶] I hop out in broad day, I did that. [¶] Hitman with the gun play, you know that. [¶] I said Adams, double back, and deuce that. [¶] Deuce eight, fuck a stain on bullet gang. [¶] Only thing I know, I want his brain."  The "double back" reference was significant because when the video was shot, it was not known to the police or the public that the Ram had made a U-turn before the shooting.

William's phone contained video of Scott and Kent Gabb together the day after the shooting; Gabb was holding a revolver that looked like the same weapon Gabb had been holding in a video shot the day before Smith was killed.  William's phone also contained video showing William, Scott, and Gabb inside a Dodge Ram one day before the Smith shooting.

More than a year after the Smith shooting, Gabb was placed in a jail cell with an undercover informant and concealed recording devices.  Gabb told the informant the detectives wanted to question him about a shooting.  Gabb said the only people who knew about the shooting were the "young homie" and the "big homie,"[4] and they were already in jail.  He referred to the "young homie" as Marqus, and said the big homie was on parole.

Gabb told the informant he had seen both the young homie and the big homie when they were placed in the same holding cell at court.  There, the big homie showed Gabb the police reports

---

[4]      At the time of the Smith killing, William was 26 years old and Scott was 19 years old.

relating to the case.[5] Gabb saw in the documents that the police knew three men were involved but had only identified the other two men, not himself: "They didn't have me on nothing." Gabb reported the detectives knew a rented car had been used and were in possession of cell tower information, but he knew the cell tower information would not place him at the scene of the crime because he did not have a phone that day. "I didn't have no phone and couldn't nobody else identify me," Gabb said. Gabb agreed with the informant that his fingerprints could be inside the rental car, but the two men agreed the presence of fingerprints did not prove anything. Gabb said they had used a revolver and the police did not have shell casings.

Gabb told the informant that according to the paperwork, a female witness in the car at the time of the shooting did not see him. The report said there were three Black males, one was driving and two "hopped out." Gabb confirmed he and the little homie had jumped out of the car, but he was confident no one had seen their faces because they were wearing masks. Gabb questioned how the witness could know they were three Black males if they were all wearing hoodies, masks, and gloves. He said the witness would not have seen who the driver was because the vehicle's windows were tinted. Gabb and the informant

---

[5]     Gabb, Scott, and William were all in the same courthouse on July 21, 2016. William was representing himself at that time, and he had received police reports on July 20, 2016, that listed William, Scott, and an unidentified man as suspects in the Smith shooting. The reports referred to cell tower activity and to the use of a rental vehicle, but they did not mention the type of guns used or the absence of shell casings.

agreed the only problem was that the others were "caught in that ride."

The informant asked if the witness, the girlfriend of the person they "smoked," was a member of a gang, and Gabb said she was from "V.N." The informant asked why they had failed to "pop" her, and Gabb answered that he had not known she was in the car.

Gabb told the informant that no one followed them after the shooting. They drove to the territory of the Eight Treys and disposed of the "blowers" and a shell casing before dropping Gabb off at home. A few days later, Gabb phoned the big homie, who mentioned he was going to go see his "P.O." at the "P.O. office." Gabb tried to call the other two later, but their phones were turned off. He learned from someone else that they were in jail. They had been arrested, along with the big homie's girlfriend, when the big homie went to see his parole officer. They were caught in the same car that had been used in the shooting. "They go to jail with two guns, like, a pound of weed." Those were not the guns used in the shooting, though. Gabb said the revolvers used in the shooting, an eight-shot revolver and a five-shot revolver, were "gone"; he had given the eight-shot revolver to his uncle.

Gabb was taken to an interview room where detectives showed him photographs and a report indicating that his fingerprints were found on a can of pepper spray found in William and Scott's possession. One of the photographs depicted Gabb with Pringle. When Gabb was returned to the cell, the informant asked what had happened. Gabb said they were about to book him for murder and that someone had to be talking to the police. The police had photographs of the car driving away and

17

photographs of him with the big homie and the big homie's girlfriend. Some of the photographs showed Gabb and the homie with big guns, but not the gun used in the shooting. They also had a photo of Gabb in the rented truck, with mace spray.

### 7. William's Arrest and Firearm Possession

On March 16, 2016, William arrived for an appointment at his parole office in a Dodge Ram pickup truck. Pringle drove the truck, William sat in the front passenger seat, and Scott sat in the back seat. William was arrested when he entered the parole office.

A detective found a purse on the front passenger floorboard containing Pringle's identification, a Galaxy cell phone, and two loaded stolen .45 caliber handguns. One was a Glock and the other was an FNP.[6] There was a gold iPhone 6 on the front passenger seat and a white iPhone 5 in the back seat. The phone found on William's seat contained a number of selfie photographs of William. The phone found in the back seat was registered to Scott. This phone contained selfie videos of Scott rapping that had been filmed inside a truck on the day after the shooting. The police also found a radio scanner inside the truck that could be used to listen to police radio transmissions.

### 8. Scott's Arrest and Firearm Possession

Scott was arrested on July 14, 2016. His backpack was found to contain a loaded firearm.

---

[6] A cell phone found at the scene of the Prince shooting and linked to William contained a search within the phone's internet search history for the same caliber of FNP handgun.

18

B.    Defense Evidence

1.    **Scott**

Criminalist and firearms analyst Carole Acosta testified she had examined Bay's car. The car had been struck by 10 bullets. With the exception of one shot, all the bullet impact marks came from the driver's side of the vehicle toward the passenger side of the vehicle. Bullet trajectory analysis is not an exact science. "Roughly speaking," the analyst takes a rod and puts it into a hole to see where it goes. This is what Acosta did when analyzing the trajectories on Bay's car. In her opinion, the bullets used in the Smith shooting were most consistent with 9-millimeter bullets but could have been .357 or .38-caliber bullets.

Crime scene reconstruction expert Bryan Burnett testified the bullet pathways on Bay's car were downward, consistent with shots being fired from inside a vehicle that was a bit higher than her car. Only one bullet pathway was inconsistent with being fired from a truck, and Burnett believed it to have been from a different incident. Burnett testified it was possible that the firearms were fired by shooters standing outside the truck, but he believed the shots "probably" came from inside the truck. The weapons were at approximately the same height as they were fired. Burnett based his opinion on the narrative report and diagrams of another criminalist; he had not examined the car or seen photographs of it from the tow yard. He had a photograph from the crime scene.

Burnett acknowledged trajectory analysis had a 5 percent error rate. That error rate can result in a significant difference in projected trajectory if the bullet was fired from a distance. He had assumed the vehicle holding the shooters was a Chevy 150 and that it was at a specific location. Burnett did not measure

19

the window height of a Dodge Ram with its windows down. He did not know whether the vehicle used in the shooting had fully or partially inflated tires. He did not know if the street was sloped. He lacked certain information about distances that could make a difference in his assessment.

Forensic expert Ernest Koeberlein testified concerning the cell tower evidence relevant to the Smith shooting. Koeberlein testified that a cell phone uses the cell phone tower with the strongest signal, not necessarily the closest one. Cell tower mapping does not demonstrate the exact location where a phone is located within the radius of a cell tower. The last call on William's phone prior to the Smith shooting, which came in at 6:38 p.m. and lasted until 6:40 p.m., hit a cell tower located on Figueroa. Based on his estimation of coverage area, the closest the phone could have been to the crime scene at that time was the intersection of Flower and Adams.

A private investigator testified it took him approximately 6 minutes, 30 seconds to drive from the intersection of Flower and Adams to the scene of the Smith shooting on the same day of the week and at the same time of day as the shooting.

An automotive placement manager testified that 102 Dodge Ram 1500 pickup trucks in a monotone silver color were sold by dealerships between December 1, 2015, and March 15, 2016, in Los Angeles area zip codes.

2.    **William**

Gang expert Kimi Lent testified that if someone from another gang was caught in West Boulevard Crips territory, it would not be expected or mandatory for a West Boulevard Crip member to take action against that person.

"Bullet gang" in Scott's rap referred to the West Boulevard Crips. "I whack those every time I see that" means he strikes out the other gang's graffiti. Gang members who rap sometimes rely on news articles for material for their raps in order to show they know what they are talking about, as well as for entertainment. Lent had encountered instances in which gang members took credit for crimes they had not committed; they did so to make themselves look more active and "bigger" in the gang than they actually were.

Lent testified that multiple gangs used Texas Rangers hats and from Scott's reference to "T hats" she believed he was referring to the Eight Treys. For Scott to say "Tramp K" was to disrespect the Eight Treys. On cross-examination, she acknowledged that rival gangs are usually located close to each other, and the Eight Treys' territory is a "pretty significant distance" away from that of the West Boulevard Crips. If a person who was rapping about "T" hats had just shot and killed a person who was wearing a "T" hat and was a member of the Rolling 20's, then the person was probably referring to the Rolling 20's.

An eyewitness identification expert testified that identifications are adversely impacted by the passage of time. Traumatic stress, something that threatens the life or safety of a person or people around them, can affect memory. Repeated identifications can result in a commitment effect, meaning that once a witness has identified a person, he or she becomes convinced that person is the culprit even as the original memory of the incident fades over time; the identified suspect becomes increasingly familiar and is the fresher face in the witness's mind. Witnesses can make mistakes in their identification, and

21

they tend to stick with their identifications even when they are demonstrably incorrect.  Cross-racial identifications are more difficult and more error-prone.  If the witness has had contact with the suspect before the event, that can result in familiarity, which allows for accurate identification.  The length of time of a conversation with a suspect before the event can also impact the accuracy of an identification.  If the incident is not traumatic, observations from a closer distance are more accurate; but if the incident is traumatic, the closer the proximity, the more overwhelming the trauma and threat, which is disruptive.

When a person is examining a "pristine" photographic lineup, meaning it is not suggestive and the person administering the lineup does not know who the suspect is, a quick, confident choice tends to be associated with accuracy.  If the identification test is suggestive, then confidence is not related to accuracy at all.  A photographic lineup can be suggestive if the photograph of the suspect is somehow different than the other photographs in a way that would draw attention to that photo, or if the person administering the lineup consciously or unconsciously influences the person making the identification.  It could be suggestive if the person recalls the suspect having braided hair and only one of the photographs in the lineup shows a person with braided hair, or if one photograph differs in size from the others.  If a person has reason to believe the suspect's photograph is in a lineup, that "pretty much guarantees" the witness will make an identification from the lineup.

Lane testified about the different interviews of Davis and the photographic lineups he was shown, as well as the loss of the recording from the interview in which Davis identified William.

William testified in his own defense and denied committing the charged offenses. He acknowledged four prior adult felony convictions. William testified he had been a West Boulevard Crip for 14 years and he considered himself an active member. He testified the gang had committed murders, attempted murders, robberies, burglaries, and thefts, with a primary focus on committing crimes that made money.

William admitted being a drug dealer. He admitted Andre McCoy rented the Dodge Ram truck in 2016 and that he (William) had possession of it. William had McCoy rent a car for him before. William liked to have different cars because he did a lot of business from the car. William admitted having possession of the black minivan that was described in conjunction with the robbery and attempted murder of Prince but denied having it at the time of the Prince incident. Additionally, William testified he had possession of two different Infinitis. He denied having a dark Toyota Prius.

William testified that at the time of the Foxworth shooting he lived near the gas station where the shooting took place. He had been to that gas station before but was not there on August 18, 2015. He denied having possession of the cell phone that had been linked to him by the prosecution evidence on the date of the offense; anyone could have had the phone that day. William used "a lot of phones" for his work and often allowed others to use them. William had never met Mitchell. William had never sold oxycodone.

William denied possessing the phone attributed to him on the date of the Yang robbery. He testified he did not rob Yang, but he did have Yang's watch, knew it was Yang's, and tried to sell it the day after the robbery. He and a potential buyer

23

negotiated over the price for the watch; during those negotiations William said he would have to split the proceeds. That sale fell through, but William ultimately sold it to a jeweler for $30,000.

William testified he did not take Berto's Rolex watch. He acknowledged a photograph of a watch like Berto's was found in one of the phones associated with him, and he said he did not know why it was on the phone. He had never seen the Rolex watch until coming to court. He admitted his phone contained a photo depicting himself wearing a Rolex but testified he bought it from a jeweler.

William testified that at the time of the Smith shooting he visited his mother daily at her home a few minutes away from the Smith shooting location. He was at his mother's on the day of the shooting in the early afternoon. Later that day William met with McCoy twice. In the latter meeting, William told McCoy to extend the Dodge Ram's rental and gave him money. William had the Ram at that time. He wanted the rental extended on the Ram because he was going to a concert that night. According to William, he and some friends went to a concert the night of the shooting. William also testified he had given the truck keys to another person, was picked up by another person, and went to dinner and then to the concert. He denied he possessed the phone that tied him to the shooting on the date of the shooting. William also testified he drove the Ram to the concert.

William denied being present at the Prince robbery and attempted murder. He denied searching on his phone for an FNP firearm. William said illegal bear mace was in his car when he was arrested because Gabb had left it there. He claimed not to have known Pringle had guns the day of his arrest.

William testified that while he was representing himself before trial, he had received more than 1,000 pages of discovery relating to the case. He shared that discovery with Gabb when they were in jail awaiting court in July 2016. He offered an alternative reading of Gabb's statement to implicate a different person and testified that numerous assertions Gabb made were not true.

### C.    Verdicts and Sentences

#### 1.    **Scott**

The jury convicted Scott of the first degree murder of Smith (count 1), and found true the special circumstance allegations under section 190.2, subdivisions (a)(21) and (a)(22). The jury found Scott not guilty of the attempted murder of Bay (count 2). He was found guilty of both counts of unlawful firearm activity (counts 9 and 12).

The court sentenced Scott to life imprisonment without the possibility of parole for the special circumstances murder of Smith. The court imposed a total of five years four months for the two unlawful firearms activity counts. Scott appeals.

#### 2.    **William**

The jury found William guilty of murdering Smith (count 1), and further found that the murder was intentional and committed by discharging a firearm from a motor vehicle. William was found not guilty of the attempted murder of Bay (count 2). The jury found William guilty of the first degree murder of Foxworth (count 4), and found the murder was committed during the commission of a robbery (§ 190.2, subd. (a)(17)(A)). William was found guilty of each of the four charges of possession of a firearm by a felon (counts 5, 8, 13, and 14).

25

The jury convicted William of the premeditated attempted murder and robbery of Prince (counts 6 and 7). The jury also found William guilty of robbing Berto and Yang (counts 10 and 11).

William waived a court trial on the multiple murder special circumstance allegation, which the court then found to be true.

For the special circumstances murder of Smith (count 1), the trial court sentenced William to life imprisonment without the possibility of parole.

For the special circumstances murder of Foxworth in count 4, William was sentenced to a consecutive term of life in prison without the possibility of parole.

On counts 5, 8, 13, and 14, the court sentenced William to four consecutive terms of 25 years to life in state prison. The court stayed the sentences on counts 8 and 14 pursuant to section 654.

For the attempted murder of Prince (count 6), the court imposed a consecutive sentence of 45 years to life in prison for the offense. For robbing Prince (count 7), the court sentenced William to 25 years to life in prison, with a minimum parole eligibility of 15 years (§ 186.22, subd. (b)(5)). The court stayed the count 7 sentence pursuant to section 654.

For each of the second degree robberies in counts 10 and 11, William was sentenced to a consecutive term of 25 years to life in state prison. In reciting the sentences imposed by the trial court, we have omitted reference to those imposed for gang, firearm, prior conviction, and strike enhancements.

William appeals.

## DISCUSSION

Each appellant separately appeals and attempts to join at least one other appellant's arguments on appeal. Joinder is broadly permitted (see Cal. Rules of Court, rule 8.200(a)(5)), "but each appellant has the burden of demonstrating error and prejudice." (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11 (*Nero*).) Scott properly joined in two of William's arguments, identifying them with specificity and providing particularized argument supporting his claim for relief. William identified specific arguments in Wesley's brief that he believed were equally appliable to him, and he also included a blanket joinder in "all issues raised in the opening brief[s] filed by co-appellants Wesley and Scott that would affect the judgment in appellant's case." Wesley presented a blanket joinder stating that he "joins in any issues raised by co-appellants to the extent any such issues are pertinent to his case and beneficial to him on this appeal."[7]

The California Supreme Court has criticized blanket joinders in claims raised in a multiple defendant appeal, stating, "We strongly disapprove of this seriously improper tactic." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant*).) California Rules of Court, rule 8.200(a)(5) is not satisfied by "cursory and unfocused statements" of joinder, and each defendant continues to have the burden of demonstrating error and prejudice. (*Bryant*, at pp. 363–364.) Neither the

---

[7] Wesley did advise the court that if his co-defendants' issues were not "on their face applicable to him," he would file a separate joinder with particularized argument. No such document was ever filed.

27

reviewing court nor respondent "is required to divine which aspects of a claim might be adverse to a particular defendant, rendering him unwilling to join the particular claim at issue. Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground."  (*Id*. at p. 363.) Finally, the court warned it would not "assume that each defendant has standing to raise each and every claim raised in the briefs or that he preserved a claim for appeal by taking appropriate and timely action below."  (*Id*. at p. 364.)  We therefore consider appellants' arguments made by joinder only if the appellant has met his duty to spell out how the claimed error resulted in a miscarriage of justice as to him.  (See *Nero*, *supra*, 181 Cal.App.4th at p. 510, fn. 11.)

I. ***William:  Issues Relating to Admission of Juvenile Prior***

In count 1, William and Scott were charged with shooting rival gang member Smith in the territory of Smith's gang in 2015.  William's criminal record included a 2007 juvenile adjudication of assault with a deadly weapon, plus a gang enhancement, the facts of which involved William entering a rival gang's territory and shooting at a rival gang member.  Prior to William's testimony, the trial court ruled the juvenile adjudication would not be admitted for general impeachment, but it deferred ruling on the People's request to introduce this evidence pursuant to Evidence Code section 1101, subdivision

28

(b).[8] After William testified that although some members of his gang demonstrate force or shoot at rivals when they encounter them, he personally did not, the People renewed their request to present evidence of William's juvenile offense. The court refused to allow the People to introduce the facts of the prior offense under Evidence Code section 1101 because William had begun his testimony without a ruling on the issue, but it concluded the evidence was admissible to impeach William's obviously false testimony.

On appeal, William contends the court erred when it failed to rule on the admissibility of the juvenile offense prior to the commencement of his testimony, and this error deprived him of the opportunity to make a knowing and voluntary waiver of his Fifth Amendment rights and denied him the effective assistance of counsel. He also argues the evidence was inadmissible and the court abused its discretion under Evidence Code section 352 by admitting the impeachment evidence because it was cumulative and more prejudicial than probative. In the alternative, he

---

[8]     Evidence Code section 1101 provides that unless an exception applies, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) However, it does not prohibit the admission of evidence that a person committed a crime or other act when that act is relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, etc.) other than his or her disposition to commit such an act, and it does not affect the admissibility of evidence offered to support or attack the credibility of a witness. (*Id.*, subds. (b) & (c).)

asserts his counsel provided ineffective assistance by failing to secure a ruling before William testified and by asking the questions William answered in such a way as to open himself up to impeachment with his prior juvenile crime.

### A.     Trial Court Proceedings

#### 1.     **Beginning of the Defense Case**

On July 24, 2019, at the conclusion of the prosecution's case, William asked the court to decide which, if any, of his prior convictions could be used against him for impeachment if he were to testify. Among other priors, the prosecutor wanted to introduce the facts underlying William's 2007 juvenile adjudication for assault with a deadly weapon (§ 245, subd. (a)(2)) with a gang enhancement because in that offense William had driven into the territory of a rival gang, called out "Where you from?" to a rival gang member, and then shot him; on the same day, William accidentally shot himself while on another mission and lied to the police about that as well. The People confirmed they were seeking to introduce the facts of the underlying offense pursuant to Evidence Code section 1101, subdivision (b).

The court responded, "I'm not going to allow it for impeachment," and asked the prosecutor to clarify the basis for the argument that the facts of the juvenile offense were admissible under Evidence Code section 1101, subdivision (b). The prosecutor explained, "[S]pecifically as to the fact that it was a gang-related crime with the gang enhancement found true, it shows intent and knowledge, which are necessary elements in this case both to the crimes, and to the allegations, and to the special circumstances. [¶] One of the special circumstances is not only active participant, but knowledge of the gang's

activities. . . . [T]he gang allegation in there also has a specific intent element that is the exact same one that is present in the case before us."

The court reserved its ruling on the admissibility of the evidence pursuant to Evidence Code section 1101, subdivision (b). William did not ask the court to rule at that time or indicate any dissatisfaction with the court's decision to delay its ruling.

The jury entered the courtroom, the People rested, and William gave his opening statement. In his opening statement, William's counsel advised the jury that William had decided he would testify in his own defense. Counsel told the jury, "[T]here will be evidence that William Saulsberry has been convicted of other crimes, as you heard previously in voir dire. He has been convicted of crimes, and you'll hear that. You'll hear he's been convicted or 459's, burglaries. You'll hear about Vehicle Code violations he's been convicted of."

### 2. **William Testifies**

William began his testimony on July 30, 2019. Immediately before he took the stand, the court asked William's counsel if he had any matters to raise with the court. William's counsel responded in the negative. It does not appear, and William does not argue, that his counsel made an effort to obtain a ruling on the reserved evidentiary issue before he commenced his testimony.

At the start of his testimony, William acknowledged his two prior convictions for burglary and his prior convictions for felony hit and run and receiving stolen property.

During his testimony, William testified his gang was a violent criminal street gang. His counsel then elicited the following testimony:

"Q.    And by a violent criminal street gang, you're gonna do whatever you need to do for the purposes of getting money, right?

"A.    Not necessarily.

"Q.    Well, . . . some West Boulevard Crips are involved in murders, right?

"A.    Yeah, some of them are.

"`Q.    Okay.  Tell me who some of the West Boulevard Crips are that committed murder according to your knowledge.

"A:    I can't say no names about who committed a murder.

"Q:    You don't know them or you're not going to tell us?

"A:    I don't know 'em.  I wasn't there, so I can't tell it."

### a.    Morning Session

On July 31, 2019, prior to the resumption of William's testimony, the court twice asked counsel if they had any matters to raise.  William's counsel said no.

William's testimony resumed.  William testified as follows:

"Q.    When you see a rival in an area that is within their gang, what does West Boulevard Crips, what do you do?

"A.    Some of them drive by.  Some of them may fight them.  There's all type of things they could do.

"Q.    What about shoot them?

"A.    If they choose to.

"Q.    What about you?

"A.    No."

William's counsel asked if William had ever seen a Rolling 20's member wearing a Texas Rangers hat like the one Smith was wearing when he was shot.  William said he had.

"Q.    Have you ever got into a fight with a Rolling 20's gang member when you saw that particular hat?

"A.    No.

"Q.    Have you ever shot at a Rolling 20's gang member when you saw that hat?

"A.    No.

"Q.    Is it your responsibility as a West Boulevard Crip to respond to an individual that is a rival gang member?  And what I mean by 'respond,' I mean to show some force?

"A.    No, not necessarily.

"Q.    Well, what is the responsibility?

"A.    Well, me, I'm gonna just keep doin' whatever I'm doin'.  I'm trying to make money.  I'm not worried about that."

After a brief pause, William's counsel continued:

"Q.    In the West Boulevard tradition, if you will, in your gang culture, you have to show force to other gangs, right?

"A.    Not necessarily.  You don't have to.

"Q.    Well, what if you don't?

"A.    You just don't.  There ain't no repercussions for you not to do something if you see one of them."

### b.    *After the Noon Recess*

After the noon recess, before testimony resumed, William's counsel told the court the prosecutor had informed him that the People intended to seek permission to cross-examine William on his juvenile adjudication based on William's testimony denying he shot rivals.

William's counsel denied opening the door to this area of questioning, arguing his questions about shooting rivals pertained to 2016, not 2007, when the juvenile offense took place. He advised the court he was being "very cautious" in his questioning because he was aware that "it was necessary for me preparing for this to be very cautious in my questions about those

33

issues so that I didn't open the door with respect to that 2007 matter." He argued the juvenile adjudication was remote, cumulative, and highly prejudicial.

The prosecutor argued the adjudication was relevant because William had consistently falsely portrayed himself in his testimony as someone whose prior offenses pertained exclusively to obtaining money, culminating in that morning's testimony in which William falsely denied shooting rivals. He argued the offense may have occurred eight years before the instant offenses, but William had been in custody for half the intervening time.

The court pointed out that the questions could not reasonably be interpreted as concerning William's present-day activities only, because as the jury knew, William was currently in custody. The court noted that William's testimony that he did not shoot rivals was "not consistent with what apparently has happened in the past." At the same time, the court recognized some time had passed since the offense and William had been a juvenile at the time.

The court said, "My concern is that it's not a door that [William] opened. It's a door that [William's counsel] opened. And while I am cognizant of the fact that [William] chose to answer the question the way he did, which may not be particularly truthful, I don't want [William's counsel] on the line for opening that door."

The prosecutor argued William, not his attorney, opened the door to the prior offense by making statements that were completely contradicted by his history. "I think that it's [William] trying to present himself in a certain light. And I don't think that the question was opened as much with any of the statements that were made by counsel." He argued the juvenile

34

conduct had already been "highly probative and relevant even before this statement [William's testimony], both going to the intent necessary for the gang allegation, the intent and knowledge necessary for the special circumstance gang enhancement." William's testimony "is just one more piece that—to show one of the many ways he's been presenting himself artificially."

"I want to think about it," said the trial court. "I know you want to know ahead of time. I appreciate that you want to know ahead of time, [William's counsel]. But I want to—I want to hear the rest of what he has to say. [¶] I think that it had some independent admissibility before he made that statement, quite frankly, given some of his denials that—or some of his statements that he made before you asked him that question. And I don't think you've been anything other than incredibly competent in your representation of him." The court said it wanted to listen to more of William's testimony, "because I think he cracked that door open before [William's counsel] ever asked that question."

William's counsel asked the court to rule before he finished his direct examination of William, and the court agreed. William resumed his testimony.

As William's counsel neared the end of his direct examination, the court sent the jury out and returned to the subject of the admissibility of the juvenile offense. The court expressed regret it had not ruled on the Evidence Code section 1101, subdivision (b) issue sooner: "So on my back is the fact that I said I was going to reserve ruling on the [Evidence Code, section] 1101[, subdivision] (b) issue. And I never ruled on it

before [William] took the stand.  And that's my fault for not making sure that that was resolved."

The court said it doubted an earlier ruling would have affected William's decision to testify, but William's counsel said that William had said that if the incident is coming in, he would not continue testifying.  The court did not believe William's representation that he would have declined to testify if he had known this offense might be admitted.

Over the prosecutor's objection, the court ruled it would not allow the facts of the juvenile offense to be admitted against William under Evidence Code section 1101, subdivision (b) on equitable grounds:  It would be unfair to William to allow the People to introduce the offense pursuant to Evidence Code section 1101, subdivision (b) because the court had not ruled on the question prior to the start of William's testimony.

But the court noted there was another question:  "[T]here's two issues.  One is whether it's admissible under [Evidence Code, section] 1101[, subdivision] (b).  And the other is whether or not it's admissible because of statements that he made during his direct examination as a proper topic of the cross-examination to impeach his testimony.  Those are different things."

The court said whether the evidence was admissible for impeachment depended in part on William's testimony, and it took a break to review the testimony.  When court resumed, the trial court read the passage from William's testimony from the previous day in which William admitted his gang was a violent street gang but suggested he did not do whatever was necessary to get money and implied that other gang members, not he, committed murders.  The court said, "I do believe he came out and lied when he said that.  I mean, I don't think that there's a

36

way to get around the fact that he . . . was not being truthful when he said that."

The court discussed with counsel whether the evidence of William's prior conduct was more prejudicial than probative for the purposes of Evidence Code section 352. William's counsel conceded the evidence was probative, but argued it was too prejudicial to be admitted. He contended that even if the court gave a limiting instruction, the jury would inevitably observe that the charged shooting of Smith, a rival gang member, was "the exact same situation. He sees a [Rolling] 20['s] gang member. He's accused of going up and shooting them. They're gonna take that information and use it to show, he did that crime in 2007, so he did this one. They're not going to separate the two."

The court described the evidence as both probative and prejudicial. The court heard additional argument, then recessed for the day so it could consider the issue further before ruling.

### 3. August 1, 2017: The Court Rules, William Chooses to Continue Testifying

The following day, the court again heard argument on the issue of whether the conduct underlying William's juvenile adjudication should be admitted for impeachment because of statements William made while testifying. William's counsel argued William had interpreted the questions as in the present tense rather than referring to his conduct in the remote past; alleged the impeachment value of the evidence was "tangential"; asserted the juvenile offense was so remote as to be of minimal probative value but increased prejudicial impact; and argued it was unnecessary to go into the juvenile offense because the prosecution could already bring in four other prior offenses. He

contended the evidence would communicate to the jury that William was guilty of the charged offense, and complained that no limiting instruction would be available because the evidence would not be admitted under Evidence Code section 1101, subdivision (b).

The court responded that a limiting instruction was available for impeachment evidence, but acknowledged William's view that an instruction would be insufficient to counter the evidence's prejudicial impact. William's counsel said William would not have testified if he had known the juvenile offense could be used for impeachment, and he would not resume his testimony if the evidence would be admitted. Finally, William's counsel argued the People already had so much other "ammunition" with which to attack William's credibility that there was no reason to use the juvenile offense.

The People argued none of their other evidence would counter the false evidence that William had put forward that he was a person who did not shoot at his rivals, and also contended the evidence was more probative than prejudicial.

After the parties submitted, the court said, "All right. I did rule with respect to general impeachment with prior felony convictions. And I ruled in that regard that this juvenile adjudication was not going to come in. And it isn't coming in for general impeachment of the defendant's testimony. [¶] Nothing has changed with respect to the fact that I excluded it for that purpose, and it's not coming in for that purpose."

"In addition to that," the court continued, "I had reserved ruling on the [Evidence Code, section] 1101[, subdivision] (b) issue. And it's my fault that that didn't get resolved before [William] took the stand. And as a result of that, I am not

38

allowing the People to use this under [Evidence Code, section] 1101[, subdivision] (b), which has been their request for a long period of time."

The court then turned to the impeachment issue that had arisen during William's testimony. William, the court observed, testified under peril of being cross-examined; he took an oath to tell the truth; and the People are permitted to cross-examine a witness to the extent they believe there is evidence directly impeaching the witness's testimony. The court distinguished specific impeachment, offered to refute particular statements made by a witness, from general impeachment with prior convictions. The court expressed confidence the jury could follow instructions on the appropriate use of the impeachment evidence.

The court concluded the evidence was "direct impeachment of [William's] testimony, and I'm going to allow [the] People to ask about it." To William's counsel, the court said, "I don't think that it is your fault that [William] answered the question the way he did. You asked the question, but he chose to answer it the way he did. And so whatever was in his mind when he answered it, it's up to him to decide how he wants to deal with it in response to any other questions on the issue. [¶] But I don't see the fault as being the question. I see the issue as being the answers. And so that's my ruling."

After conferring with his client, William's counsel told the court William did not want to resume the stand. With his attorney's permission, William personally addressed the court at length. William said he had told his attorney before he testified that he would not testify if his juvenile offense would come in. He blamed the court and counsel: "You said you was gonna make a ruling on it. You never did. So that's a mistake on your behalf.

Then my attorney opened up the door for a question that I answered. That's what's now allowing the D.A. to ask me that question. So he messed up. [¶] He messed up, and you messed up by not making a ruling before I testified. And that right there is too prejudicial to me to this jury."

The court told William it had remedied the issue concerning the delayed Evidence Code section 1101 ruling by deciding the issue in William's favor. As for William's complaint about his attorney, the court said the People would be allowed to ask William about his prior offense because of William's testimony, not his counsel's action: "You chose to answer the question in the way that you did. The question he asked was not an inappropriate one, in my opinion; but you chose to answer it, and that's how you chose to answer it. That's on you, not on [your attorney] or me." The court advised William there were many ways his counsel could approach the impeachment evidence and "lessen the blow" of this information.

William told the court, "[I]f he would have never asked me that question, I would have never answered it. And I know what you're talking about where there's other ways he could go into it, because when I said I don't commit violent crimes, I know I been convicted for that when I was a juvenile. [¶] But if they're not gonna be able to use my juvenile, of course I'm gonna say that."

"Well," responded the trial court, "my rulings don't give you license to not tell the truth. That's the bottom line. And while I understand that you expected . . . it wouldn't be used generally to impeach you, that still doesn't give you the right to be anything less than completely candid with this jury and to tell the truth before this jury." The court advised William he could either continue to testify or refuse to testify further, in which case the

40

court would strike his testimony and instruct the jury not to consider it.

William elected to resume his testimony, and his attorney questioned him on direct examination about his juvenile adjudication. On cross-examination, William acknowledged that his testimony the prior day that he did not shoot at rivals was not true.

B. Failure to Rule on Admissibility of Prior Before William Decided Whether to Testify

William argues the court's failure to rule on the admissibility of his juvenile offense prior to him taking the witness stand denied him the opportunity to make a knowing and intelligent waiver of his Fifth Amendment rights and deprived him of the effective assistance of counsel. As William acknowledges, prior convictions for crimes of moral turpitude, including juvenile adjudications, may be introduced to impeach a witness's credibility, subject to the balancing test of Evidence Code section 352. (Evid. Code, § 788; *People v. Castro* (1985) 38 Cal.3d 301, 313–316; *People v. Hinton* (2006) 37 Cal.4th 839, 888; *People v. Lee* (1994) 28 Cal.App.4th 1724, 1739.) Although William notes that California law permits a trial court to delay ruling on a motion to exclude priors, he argues "the better view" is that the trial court should be required to rule on the admissibility of a defendant's priors before he or she testifies. He argues that "in order to decide whether [he] should testify, he and [his counsel] needed to know if his juvenile prior would be admitted for impeachment." But William did know that. The court ruled before the People rested that William's juvenile adjudication would not be admitted to impeach his general veracity if he chose to testify.

41

William did not know when he started to testify whether the facts underlying his juvenile offense would come in under Evidence Code section 1101, subdivision (b), which is a different question.[9]  However, the trial court ensured that William was not prejudiced by its delay in ruling on that issue:  Recognizing that William had to decide whether to testify without the benefit of a ruling on the admissibility of the evidence under Evidence Code section 1101 subdivision (b), as a matter of fairness the court refused to allow the evidence to be introduced under that statute.

Ultimately, William was impeached by the conduct underlying his juvenile offense for a reason that did not exist before he took the stand:  his demonstrably false trial testimony that while some gang members might shoot rivals, he did not. This testimony opened the door to the previously-excluded evidence that William had in fact shot rival gang members, subject to the court's balance under Evidence Code section 352, because that evidence tended to show that particular statements in his testimony were false.  "[A] witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony." (*Andrews v. City and*

---

[9]    It is also a question William made no effort to have answered.  If William had believed he needed the Evidence Code section 1101, subdivision (b) ruling in order to decide whether to testify, he could have and should have asked for a ruling before he took the witness stand.  The " 'failure to press for a ruling on a motion to exclude evidence forfeits appellate review of the claim because such failure deprives the trial court of the opportunity to correct potential error in the first instance.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 143.)

*County of San Francisco* (1988) 205 Cal.App.3d 938, 945–946 [prior incidents of correctional officer's misconduct admissible to impeach his claim that he had "developed patience working with" prisoners]; see also *People v. Turner* (2017) 13 Cal.App.5th 397, 410–411 [defendant's prior arrest for possessing the same type of ammunition as that involved in present prosecution admissible after defendant testified suggesting he was framed]; *People v. Cooks* (1983) 141 Cal.App.3d 224, 324 [cross-examination of defendant about his conviction for handgun possession admissible to impeach his testimony that he had never possessed a gun]; *People v. Reyes* (1976) 62 Cal.App.3d 53, 61–62 [defendant who denied on direct examination ever engaging in bookmaking properly impeached with an otherwise inadmissible prior conviction for bookmaking].) In light of William's false testimony, the trial court appropriately revisited the question whether the facts of the juvenile adjudication should be admitted for the new purpose of rebutting his specific untruthful statements.

C.     Admissibility of the Juvenile Prior

William contends his prior conduct should nonetheless have been excluded because it was cumulative and more prejudicial than probative. The circumstances of a prior offense are admissible to directly impeach a witness's testimony, subject to Evidence Code section 352. (*People v. Dalton* (2019) 7 Cal.5th 166, 214.) We review the trial court's evidentiary ruling for an abuse of discretion. (*People v. Valdez* (2004) 32 Cal.4th 73, 108.)

We cannot say the trial court abused its discretion when it determined the evidence was more probative than prejudicial. As William testified he did not shoot members of rival gangs, evidence that he had done so was therefore extremely probative as a direct refutation of William's testimony and as evidence of

43

his present lack of veracity. It is true, as William notes, that the juvenile offense was relatively remote, but this is not particularly significant because the prior offense was introduced not to show that the juvenile conduct itself demonstrated a lack of honesty but to demonstrate that William was testifying dishonestly at the present time.

William complains the conduct was similar to the charges in the Smith murder, but the trial court could reasonably conclude that despite the similarity it was not unduly inflammatory or prejudicial. Given the serious nature of the charges against William, his already-acknowledged gang membership, and the other prior convictions presented to the jury, it was reasonable for the court to determine that evidence of his juvenile conduct was not likely to inflame the jury. " ' "The prejudice which [Evidence Code section 352] is designed to avoid is not the prejudice or damage . . . that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' [Citation.] Painting a person faithfully is not, of itself, unfair." (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.) Moreover, the jury was instructed with CALCRIM No. 316 on the appropriate use of the impeachment evidence: If the jury found a witness had committed a crime or misconduct, that fact could be considered "only in evaluating the credibility of the witness's testimony." We presume the jury understood and followed the instructions given. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 202.)

The evidence, moreover, was not cumulative: Although William argues his four prior adult convictions and his admissions to being a gang member and a drug dealer were

44

sufficient to impeach his character and credibility, none of that evidence tended to prove that William had testified untruthfully in the present case.

William also argues that the facts underlying his juvenile offense were inadmissible because Evidence Code section 1102, subdivision (b) requires evidence rebutting a witness's evidence of his good character to be in the form of opinion evidence only, not specific acts of misconduct. As we have already concluded the evidence was properly admitted on other grounds, we need not consider this argument.

### D.    Ineffective Assistance of Counsel

In the alternative, William argues his counsel provided ineffective assistance of counsel within the meaning of *Strickland v. Washington* (1984) 466 U.S. 668 when he asked William questions concerning his responsibility, as a member of his gang, to show force when he encountered a rival, thereby opening the door to admission of his juvenile adjudication without having obtained a definitive ruling on the admissibility of his juvenile adjudication prior to commencing his testimony. To establish ineffective assistance of counsel, William must demonstrate that " '(1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner.' " (*In re Jones* (1996) 13 Cal.4th 552, 561.)

William first argues his counsel's representation fell below the standard of care when he "questioned appellant about violence in gang culture [when] counsel knew that the court was

still considering admission of the juvenile prior under Evidence Code section 1101, subdivision (b)," thus running the risk of the evidence coming in under that statute.  William cannot establish any prejudice from testifying before that issue was resolved because the trial court ultimately ruled in William's favor and did *not* admit the evidence under Evidence Code section 1101, subdivision (b).  We need not consider whether counsel's questioning before obtaining a definitive ruling constituted deficient performance because William has not demonstrated any prejudice.  (*People v. Maury* (2003) 30 Cal.4th 342, 416, disapproved in part by *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901.)

Next, William acknowledges that his counsel made a "tactical decision to rebut the gang expert's claim that gangs expect, even require, violence from their members toward rivals, through appellant rather than relying on the testimony of his gang expert," but he argues counsel's representation was deficient when he questioned William about what he personally would do when encountering a rival gang member.  Claims of ineffective assistance based on counsel's alleged actions or failure to act in a particular manner should be raised in a habeas corpus proceeding.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

William, however, claims the issue is properly raised on appeal because "[t]here could be no tactical reason" for counsel's inquiries.  (See *People v. Ray* (1996) 13 Cal.4th 313, 349 (*Ray*) ["In order to prevail on [an ineffectiveness] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission"].)  Trial counsel indicated he framed his question with awareness of

46

the need to avoid opening the door to the prior conviction, and the trial court stated it believed the question was appropriate, but the record does not shed light on counsel's reasons for posing these questions. As the record on appeal does not affirmatively demonstrate the absence of any rational tactical purpose for counsel's inquiry, William's claim must be denied on direct appeal. (*Ibid*.)

## II. *William and Wesley: Refusal to Exclude Davis Identification*

William and Wesley moved to exclude Davis's past and future identifications of them because the recording[10] of a September 29, 2015, police interview with Davis had not been retained by law enforcement. Both William and Wesley contend the trial court erred when it denied their motions.

The federal due process clause requires the state to preserve "evidence that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488 (*Trombetta*).) The evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id*. at p. 489.) Where the lost evidence is not exculpatory on its face, a state's failure to preserve such "potentially useful" evidence violates due process only where the defendant shows bad faith on the part of the prosecutor or police.

---

[10]     On appeal, Wesley refers to the recording as a videotape, but the court, the prosecutor, and William and Wesley's trial counsel all described it as an audio recording.

47

(*Arizona v. Youngblood* (1988) 488 U.S. 51, 57–58 (*Youngblood*).) The presence or absence of bad faith on the part of the state is closely related to law enforcement's "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Id.* at pp. 56–57, fn. *.) We view the evidence in the light most favorable to the superior court's finding and determine whether there was substantial evidence to support its ruling. (*People v. Carter* (2005) 36 Cal.4th 1215, 1246; *People v. Alvarez* (2014) 229 Cal.App.4th 761, 776.)

A.    Trial Court Proceedings

On September 29, 2015, approximately six weeks after the Foxworth shooting, Davis met with detectives and looked at a photographic lineup. He identified a photograph of William as the person who shot Foxworth. Lane recorded the interview, and Lane believed he had loaded the recording onto an official computer system prior to his retirement. However, De La Torre subsequently searched the computer system but was unable to locate the recording. The recording went missing before either William or Wesley was arrested.

Counsel for William and Wesley[11] argued the audio was not maintained in good faith and he "believe[d]" Davis gave exculpatory evidence as to William and/or Wesley during the interview as to whether they were involved in the Foxworth incident. Counsel asserted that on August 21, 2015, Davis had been shown a photographic lineup and identified a person who was not William or Wesley as the shooter. "And then now we're in a car," counsel said, referring to the September 29, 2015,

_____

[11]    William and Wesley were represented by the same attorney at their separate trials.

48

meeting. "I have no idea what was said in that car, none whatsoever. I don't know if Junior Davis was influenced, whether he looked at things and said, you know, that doesn't look like the guy. And then they showed him. Oh, that's the guy. I don't know. And that's the fact of what I believe I have a basis to show that there's some exculpatory information."

The prosecutor argued Davis had not established the lost interview was exculpatory, particularly as to William, because Davis had identified William as the shooter. The prosecutor disputed defense counsel's account of the August 21 interview, stating that Davis had not in fact identified anyone as the shooter in the earlier lineup. The prosecutor represented that Davis had stated that one of the people in the photographs looked familiar and that he would know the person if he saw him in person. However, Davis did not circle a photograph.

The prosecutor pointed out that the police had every motivation to maintain the recording because it contained Davis's identification of William as the shooter. The prosecutor also argued the defendants had comparable evidence reasonably available to them despite the loss of the recording, because Davis, Lane, and De La Torre were all available to testify.

The trial court found no *Trombetta* or *Youngblood* violation. For the *Trombetta* factors, the court said, "I'm not saying that the evidence might have demonstrated exculpatory information. But it seems to me that Mr. Davis is available to testify and the officer is available to testify," so comparable evidence remained available despite the loss of the recording. The evidence concerning the earlier interview and the lost interview was all available to the defense. On the *Youngblood* analysis, the court found the defendants had failed to demonstrate that the failure

49

to preserve the recording was intentional, and there was no logical reason to think that it was intentional: Davis identified William as the shooter in the lost recording, "which is something I would imagine they [the police] would want to keep."

B. Sufficiency of the Evidence

The trial court did not make a finding whether the absent evidence was exculpatory on its face, or even if it was potentially useful to Wesley and William. Instead, the court focused on the other portions of the *Trombetta/Youngblood* inquiries: whether comparable evidence was available (*Trombetta*) and whether the loss of the recording was in bad faith (*Youngblood*). The evidence was sufficient to support the trial court's findings.

First, the evidence was sufficient to demonstrate that comparable evidence was available to Wesley and William despite the absence of the recording. William called Lane as a witness in his trial, and Davis and De La Torre were witnesses at both trials, so they could be (and were) questioned about Davis's identification of William and non-identification of Wesley, exactly what happened during the lost interview, and the loss of the recording. Therefore, even if the missing recording were to have had an exculpatory value that was apparent before it was lost, it was not "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta*, *supra*, 467 U.S. at p. 489.)

Second, the evidence was sufficient to support the trial court's determination that to any extent the evidence was potentially useful, the evidence was not destroyed in bad faith. As the court noted, the recording contained Davis's identification of William as the shooter, and this inculpatory evidence gave law enforcement a compelling motivation to preserve it. William

50

theorizes the recording would have shown that the detectives coached Davis into making his identification, and Wesley urges us to conclude the recording was destroyed because during the interview the detectives communicated to Davis that Wesley was the second perpetrator, prompting Davis's later identification of Wesley at the preliminary hearing, but this is speculation unsupported by evidence.

Neither appellant has demonstrated any error in the court's denial of the motions to exclude Davis's identifications.

III. *William and Scott: Admission of Statements Made to an Undercover Agent*

Over defense objection, the prosecution presented statements from Gabb, obtained by an undercover agent, in which Gabb incriminated himself, William, and Scott in the Smith murder.

A. Confrontation Clause

On appeal, William and Scott contend that admitting this evidence violated the Confrontation Clause of the United States Constitution and their due process right to a fair trial. The Sixth Amendment right of confrontation applies only to testimonial statements. (*Crawford v. Washington* (2004) 541 U.S. 36, 51 (*Crawford*).) A statement is testimonial if it is made with some degree of formality or solemnity, and the primary purpose of the statement must pertain to a criminal prosecution; that is, "the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984; *People v. Leon* (2015) 61 Cal.4th 569, 603.)

William and Scott argue the statements Gabb made to the undercover agents were testimonial in nature because the agent's purpose was to establish past events for criminal prosecution. The California Supreme Court has recently stated, "In the context of an interrogation, as used in the colloquial and not legal sense, ' "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." [Citation.] . . . An interrogator's questions, unlike a declarant's answers, do not assert the truth of any matter.' [Citation.]  In that regard, the high court has also noted that statements made unknowingly to an informant or statements between fellow prisoners are 'clearly nontestimonial.' (*Davis v. Washington* [(2006) 547 U.S. 813,] 825.)" (*People v. Fayed* (2020) 9 Cal.5th 147, 168–169.)  Other courts have similarly concluded that statements unwittingly made to an informant in a jail cell are not testimonial.  (See *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67–68; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402; *People v. Almeda* (2018) 19 Cal.App.5th 346, 362–363.)  In this case, there is no evidence indicating Gabb knew he was speaking to a police informant or otherwise anticipated his statements would "be used prosecutorially." (*Crawford*, *supra*, 541 U.S. at p. 51.)  Accordingly, his statements were nontestimonial and do not implicate the Sixth Amendment right to confrontation.

B.  Reliability of Statements Admitted as Statements Against Penal Interest

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement.  (Evid. Code, § 1200.)  Hearsay is inadmissible unless it falls within an exception to the hearsay rule.  (*Ibid*.)  One such exception is

found in Evidence Code section 1230, which provides in part, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if . . . the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." "To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) We review a trial court's ruling under Evidence Code section 1230 for abuse of discretion. (*Ibid.*)

William and Scott argue that Gabb's statements were inadmissible as declarations against penal interest because they were unreliable, false in several respects, and untrustworthy. We cannot say the trial court abused its discretion when it determined Gabb's statements were sufficiently reliable and trustworthy as to be admissible as declarations against penal interest. Gabb made his statements to a person he believed to be a fellow gang member. As there was evidence before the court that gang members faced negative consequences if they

53

attempted to take credit for criminal acts they had not committed, the fact that Gabb's audience was someone he understood to be a gang member suggested Gabb would have been unlikely to take credit for crimes he did not commit.

Gabb's statements were also corroborated in many details. For instance, Gabb said that during the shooting, he and the "young homie" wore masks, while the "big homie" would have been hard to see because of the vehicle's tinted glass. An eyewitness testified that the two passengers wore masks but the driver did not. Gabb identified the weapons that were used as revolvers rather than semi-automatic handguns, and this was consistent with the fact that no casings were found at the scene of the shooting. He correctly reported that Smith's girlfriend was present when he was shot, and that she was affiliated with a particular gang. Gabb's account was also supported by the evidence that William and Scott had possessed the rental vehicle used in the shooting on the day of the shooting; and furthermore, that phones linked to William and Scott had been in the area where the shooting occurred at approximately the time of the shooting.

Additionally, Gabb's account that his two co-participants were apprehended in the rental car they had used for the crime because the "big homie" had to go to his parole office corresponds with William and Scott's arrest in the rented vehicle at William's parole office. Gabb described being in the same courthouse as William and Scott one day and being able to look at the paperwork relating to the incident; he reported learning that William and Scott had been implicated by rental car and cell tower information, but Gabb had not been similarly implicated because he had not brought a cell phone with him on the day of

54

the Smith shooting. The three men had in fact been at the same courthouse on the same day, and there was evidence that William, who was representing himself in the early stages of the case, had received discovery that mentioned the rental car and cell tower information, and identified William and Scott but not the third participant.

William argues the evidence is unreliable because Gabb referred to his co-participants as "Big Homie" and "Little Homie" rather than identifying them by name, and he used the term "they" without specifying the individuals' real names. Gabb, however, did also refer to the "Little Homie" as Marqus, Scott's first name, and William was seven years older than Scott. The evidence that tended to corroborate Gabb's statement, such as the apprehension of William and Scott at the parole office in the rented vehicle and the fact that they were all at court on the same day, clearly supported the inference that the "homies" were William and Scott.

William and Scott contend Gabb's testimony contained too many inaccuracies to be reliable: Gabb said marijuana had been found in the vehicle in which William and Scott were arrested, but none was found; contrary to Gabb's account, William was not on a parole hold at the time of the Smith murder; Gabb was incorrect when he said William had previously served eight years in prison; and Gabb falsely claimed to have bailed Scott out of jail. Scott and William also argue Gabb's statement that the shooters jumped out of the vehicle is inconsistent with the evidence of the bullet trajectories and the fact that other witnesses did not recall seeing or hearing anyone exiting the truck. Statements may be reliable even if they have some inconsistencies with the physical evidence, provided they do not

negate all possibility of the statement being true. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 607–608.) The small inaccuracies as to the presence of marijuana, a parole hold, the exact length of William's previous prison time, and bail are small discrepancies that do not negate the possibility of Gabb's account being true. As for the contention that Gabb's report that the shooters left the car to shoot was inconsistent with the physical evidence, the evidence does not show that Gabb was necessarily incorrect. There was testimony that trajectory analysis is an inexact science, and the crime scene reconstruction expert who opined that the shots were fired from the truck acknowledged he made a number of assumptions about the vehicle's location, many factors contribute to a bullet trajectory, and he had neither measured a Dodge Ram's window height nor taken into account other factors that would affect the trajectory of the bullets. The fact that witnesses to the event did not see or hear the shooters exit the vehicle did not foreclose the possibility that they had done so briefly. While these details provided fodder for argument as to the weight of Gabb's account, they do not establish that the court acted outside the bounds of reason when it concluded that Gabb's statement was sufficiently reliable to be admitted as a declaration against penal interest.

IV. *William: Admission of Evidence of Threats*

William objected to the introduction of evidence that Davis received two threatening texts in September 2018, shortly before he testified at Wesley's trial, one of which read, "Do U want to die," and the other stating, "I'm watching you now." The trial court ruled the texts admissible to demonstrate that Davis was testifying despite being afraid to do so, provided that the parties stipulated that neither defendant was involved in sending the

texts.  The jury was instructed that the texts were admitted into evidence for the limited purpose of the effect, if any, that they had on Davis.  William argues the texts should have been excluded under Evidence Code section 352 as they were more prejudicial than probative, and their admission undermined his state and federal rights to a fair trial.  He contends the evidence was cumulative because other evidence established Davis' fear, specifically the telephone call he received after the Foxworth shooting and the subsequent early morning visit to his apartment by three people, whom he believed to include William and Wesley.

Reviewing the court's ruling for an abuse of discretion (*People v. Myles* (2012) 53 Cal.4th 1181, 1212 (*Myles*)), we find none here.  As William acknowledges, evidence that a witness is afraid to testify is relevant to the witness's credibility.  (Evid. Code, § 780; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368-1369.)  "A witness who testifies despite fear of recrimination of any kind by anyone is more credible because of his or her personal stake in the testimony.  Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility [citation], the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility.  For this purpose, it matters not the source of the threat." (*Olguin*, at pp. 1368–1369.)  The fact that Davis came to court and took the witness stand notwithstanding the attempts to intimidate him tended to bolster his credibility.  (See *Myles*, at p. 1211.)  Moreover, although William argues that the evidence was cumulative, these texts were recent, unlike the evidence William claims was sufficient to

establish fear, and so they tended to show that at the time of trial Davis still had reason to be afraid but testified nonetheless.

William contends the admission of this evidence was prejudicial because it suggested someone was willing to use violence to silence a witness, and despite the stipulation and the limiting instruction, "no reasonable juror could have failed to draw the propensity inference against William" and the other defendants because of the other evidence offered for the purpose of credibility that tended to equate gang membership, violence, and witness intimidation. William concludes that this evidence incurably prejudiced him on counts because its prejudicial value as propensity evidence of violence far outweighed any probative value it had on witness truthfulness. This contention is unpersuasive. As the record reflects, the jury was informed that neither defendant was involved in sending the texts, and the jury was instructed it could only consider them for the purpose of their effect on Davis. We presume the jury generally understands and follows instructions. (*Myles*, *supra*, 53 Cal.4th at pp. 1211–1212.)

## V.   *William: Failure to Instruct with CALCRIM No. 305*

The trial court has a duty to instruct on the general principles of law relevant to the issues raised by the evidence and necessary to the jury's understanding of the case. (*People v. Molano* (2019) 7 Cal.5th 620, 667.) William asked the court to instruct the jury with CALCRIM No. 305 that statements in Scott's rap videos could be considered only against Scott. CALCRIM No. 305 provides, "You have heard evidence that defendant . . . made a statement (out of court/before trial). You may consider that evidence only against (him/her), not against any other defendant." The People argued, inter alia, that Scott's

recorded lyrics constituted statements against penal interest and were therefore properly considered against both Scott and William. The court declined to give the instruction.

In William's opening brief, he argued that the court erred in refusing to give CALCRIM No. 305 because Evidence Code section 1220, the exception to the hearsay rule for admissions of a party, applies only to the party making the admission, and so Scott's rap lyrics were admissible only against Scott. In a footnote, William anticipated that the People would argue that the evidence was admissible against him under Evidence Code section 1223, a hearsay exception for the statements of a co-conspirator, and he argued that the People were foreclosed from making that argument because they would be adopting a position not advanced in the trial court.

In their briefing, the People did not make either argument. Instead, the People argued, as they did in the trial court, that Scott's lyrics were admissible against both Scott and William as declarations against penal interest under Evidence Code section 1230.

The People have the better argument. The trial court properly declined to give CALCRIM No. 305 because Scott's recorded rap lyrics were admissible against both defendants as declarations against Scott's penal interest. (Evid. Code, § 1230.) Scott's statements were clearly not testimonial: he was celebrating his exploits in a privately recorded video that was not made for the purpose of memorializing facts for a possible future prosecution. The statement was against Scott's penal interest, as he subjected himself to criminal liability for the homicide when he described shooting Smith. His statements were trustworthy because he provided multiple details that matched the facts of

the Smith killing, including facts that were not publicly known at the time the videos were made, and because there was evidence that there could be repercussions for a gang member who took credit for crimes he did not commit.  And Scott was unavailable, as he did not testify at trial.

In his reply brief, William does not dispute the admissibility of the lyrics of the rap videos against him as declarations by Scott against his penal interest.  Rather, he argues that the prosecutor was prohibited from relying on that exception to the hearsay rule to oppose CALCRIM No. 305 because prior to trial, when arguing Scott's pretrial motion in limine to exclude the rap videos, the prosecutor argued they were admissible as admissions of a party and the trial court denied the motion in limine on that basis.  William reasons that this amounted to a forfeiture of any other grounds upon which the evidence could be admissible against any party, and therefore the only basis on which the appropriateness of CALCRIM No. 305 could be argued and considered was whether the admissions of Scott could be admitted against William.  He characterizes the People's argument against giving CALRIM No. 305 as a "claim that evidence is determined to be admissible during a jury instruction conference."

Even if we assume, arguendo, that William is correct that advancing one basis for admissibility precludes presentation of other bases later, William does not identify, and we have not in our review located, any point in the trial record when William objected to the introduction of the rap lyrics against him on hearsay grounds such that the People would have been called on to articulate a theory of admissibility as to him.  From our review of the record, it appears that prior to trial, Scott filed a motion in

limine to exclude his rap videos as prejudicial, inadmissible hearsay. William did not seek to exclude the videos in his own motions in limine. William asserts that the videos were admitted "over objection by counsel for the *defendants*" (italics added), and refers this court to a page in the reporter's transcript in which William's counsel stated that he intended to join in all but one of Scott's motions in limine. William does not acknowledge that on the next page of the transcript, the court said, "Well, some of them you don't need to necessarily join in," and William's counsel responded, "I'm going to join—I think Your Honor is right."

We have not located, and William has not identified, any subsequent statement in the record as whether William intended to join this particular motion in limine. There is no indication in the record that William sought a ruling as to himself when the court heard Scott's motion in limine. William's counsel did not raise the issue of whether the rap videos were admissible against him when Scott's motion in limine was argued, and he remained silent while Scott's counsel and the prosecutor argued about whether the videos qualified as Scott's admissions and whether they should be admitted as videos or by transcript only. William's counsel spoke only after the court had ruled on the motion in limine, at which time he advised the court he did not concede the videos were filmed inside the vehicle used in the Smith killing, and he would object to their introduction if no foundation was laid that they were filmed inside the truck. The trial court recognized that counsel had made no concession and acknowledged the possibility of "a relevance or foundational problem."

William cannot now argue that the prosecutor is prohibited from defending the admissibility of the videos against him

61

because that would require "adopting a position that was not advanced in the trial court." William's failure to take any action at the hearing on the motion in limine to raise or address the admissibility of the rap videos against himself meant there was no occasion for the People to advance a position concerning the admissibility of the statements against William. We reject William's argument that CALCRIM No. 305 had to be given based on the ruling on Scott's motion in limine. The court properly refused to give CALCRIM No. 305 because Scott's recorded rap lyrics were admissible against both defendants as declarations against Scott's penal interest. (Evid. Code, § 1230.)

## VI. *William and Scott: Sufficiency of the Evidence to Support Convictions on Count One*

William and Scott contend the evidence was insufficient to support their convictions for murdering Smith, specifically with respect to the element of identity. " ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212–1213 (*Rangel*).)

62

The evidence of identity was sufficient to support the conviction.  As a starting point, as set out above in Section III.B. of our Discussion, accomplice Gabb, believing he was speaking to a fellow gang member who was in fact a confidential informant, made extensive statements describing the shooting and implicating William and Scott.  Gabb talked about committing the shooting with the "big homie" and the "young homie."  Although he did not identify William and Scott by full names, a number of his statements make clear that he meant William and Scott, not the least of which was using Scott's first name when referring to the young homie.  Gabb stated that the men, along with the big homie's girlfriend, were caught in the rental car in the shooting after the "big homie" told Gabb he was going to visit his parole office.  William, Scott, and Pringle were in fact arrested in the rented Dodge Ram truck when they went to William's parole office.  Gabb described being at the same courthouse as the other participants and reviewing the paperwork on the case, from which he learned that the police had identified William and Scott and had rental car and cell tower information, but they were unable to identify the third suspect— and Gabb explained to the informant that he knew he could not be identified by cell tower information because he had no phone that day.  Other evidence confirmed that William, Scott, and Gabb had been in the same courthouse on the same day, and that at the time they were together, William, who was representing himself at that time, had just received police reports detailing the investigation.  The "big homie" and "young homie" names Gabb used also corresponded to the respective ages of William and Scott.

Gabb's account of the events on the day of the shooting was also corroborated by cell tower evidence that phones connected to Scott and William were in the vicinity of the location of the shooting at the approximate time of the shooting and afterwards. William criticizes the cell phone evidence as reliant on an unproven assumption that a particular phone was in William's possession on the day of the murder, and he notes that he testified he used multiple phones and was using a different phone on the day of the Smith shooting. Based on the totality of the evidence, however, a reasonable jury could have rejected William's testimony and inferred that William had carried and used the phone associated with him during and after the Smith shooting.

Further evidence of Scott's identity was found on his phone, which showed he conducted internet searches about the shooting the following day and saved a screen shot of a news story about the murder. Finally, Scott's phone contained a rap video of him day after the shooting in which he bragged about committing the murder and identified the gang and attire of the victim, the street on which the shooting occurred, and the fact that they made a U-turn just before the shooting occurred. The fact that the truck made a U-turn was not known to the police or public when the video was recorded.

William and Scott, however, assert that Gabb's account is untrustworthy because it contained inaccuracies. They contend Gabb's statement that he and Scott jumped out of the car to shoot was demonstrably false because the coroner's report was consistent with shots fired from a downward angle as from a vehicle and neither percipient witness saw or heard anyone exit the truck. Scott also points out that Gabb reported that drugs

64

were found in the rental truck, when none were in fact found. "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) " ' " 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 627 (*Beck and Cruz*).)

William and Scott have not shown that Gabb's account was physically impossible or false on its face. As discussed previously in Section III.B. of our Discussion, other aspects of Gabb's account were corroborated by the evidence and the evidence did not foreclose the possibility that the shooters did briefly step out of the truck. Moreover, the existence of some discrepancies does not necessarily render Gabb's statement false. The jury was entitled to review the evidence and decide the weight, if any, to give to Gabb's statement to the confidential informant. We neither reweigh the evidence nor reevaluate the credibility of

65

witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).)

The evidence of identity was sufficient to permit a reasonable jury to convict William and Scott of Smith's murder beyond a reasonable doubt. "A jury's finding will not be reversed unless it is clearly shown that under no hypothesis is there sufficient evidence to support it. [Citation.] As long as substantial evidence supports the jury's finding, the possibility that the jury could reasonably have reached a different conclusion does not justify reversal." (*People v. Mendez* (2010) 188 Cal.App.4th 47, 59.)

VII. ***William: Sufficiency of the Evidence to Support Convictions on Counts Four, Five, Six, Seven, Eight, Ten, and Eleven***

William challenges the sufficiency of the evidence to support his convictions on all remaining counts. We review the record in the light most favorable to the judgment to determine whether substantial evidence supports the convictions. (*Rangel*, *supra*, 62 Cal.4th at p. 1212–1213.)

A. Counts 4 and 5: Foxworth Murder and Robbery

William contends that the evidence is insufficient to establish identity with respect to the Foxworth murder and robbery. Davis identified William as the shooter from a photographic lineup, at the preliminary hearing, and at trial. Cell tower evidence showed that a phone connected to William was in the area of the gas station where Foxworth was robbed and murdered when the incident occurred. Finally, Davis's identification of the other participant, Wesley, was corroborated

66

by the DNA evidence, which, while not direct evidence against William, tends to bolster the credibility of Davis's identifications.

William asserts that eyewitness identifications are often unreliable, and that Davis's identification of him was "made under suspect circumstances" because it took place more than a month after the crime, in a patrol car, and was based on a suggestive photographic lineup in which William was the only person wearing two earrings and the only one with hair in cornrows. He points out variations in Davis's descriptions of the shooter over the years and dismisses the cell tower evidence because William lived near the scene of the crime. Finally, he dismisses the evidence of Wesley's DNA under Foxworth's fingernails that corroborated Davis's identification of Wesley, stating that Wesley's presence "was not probative of appellant's presence at the scene."

The evidence of identity was sufficient to support the convictions. The testimony of a single witness is sufficient to prove a fact (Evid. Code, § 411), and, unless the testimony is physically impossible or inherently improbable, to support a conviction. (*Young*, *supra*, 34 Cal.4th at p. 1181.) No inherent improbability appears in Davis's identification testimony, and nothing about the evidence shows the Foxworth murder would have been physically impossible for William to perpetrate. "Inconsistencies in . . . initial descriptions of the perpetrator and any suggestiveness in the lineup or photo arrays they were shown are matters affecting the witness's credibility, which is for the jury to resolve." (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) As for the value of the cell tower evidence and the DNA evidence, that, too, was for the jury to decide. We do not reweigh the evidence on appeal. (*Lindberg*, *supra*, 45 Cal.4th at p. 27.)

B.     Counts 6, 7, and 8:  Prince Attempted Murder,
           Robbery, and Possession of Firearms by a Felon

William contends the evidence is insufficient to establish identity with respect to his convictions of the Prince attempted murder, robbery, and possession of firearms by a felon because it rested on the testimony of Detective Perkins, which he argues was unreliable.  Perkins saw William drive quickly away from the scene of the shooting in a black minivan, and she identified William from a photographic lineup.

" ' " 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' " (*Beck and Cruz, supra*, 8 Cal.5th at p. 627.) William argues that it was inherently impossible and "defies credulity" that Perkins could have accurately identified the driver because she was "43 feet" away and had only moments to view the driver as he sped away.

Perkins testified she saw a minivan heading in her direction at approximately 40 miles per hour.  She testified she could see the driver's face and she momentarily locked eyes with the driver of the minivan as it was 25 to 30 feet away from her. William's private investigator measured the distance that Perkins had estimated as 30 feet and found it to be 43 feet.  It is neither physically impossible nor inherently improbable that a police officer could make an accurate identification of the driver of an approaching vehicle traveling at approximately 40 miles per hour.  Moreover, Perkins not only saw the driver, but she read out the license plate number for the minivan so it would be recorded on her patrol car's audio system.  The minivan's license

plate matched the license plate of a minivan rented by William's girlfriend. This supports Perkins' identification and is also evidence tending to prove William committed these crimes.

William speculates that Perkins's identification was tainted by information provided to her by other law enforcement officers, but he does not identify any evidence to support this claim. Other evidence of William's identity included the recovery at the scene of a cell phone with his selfie photographs, although William disputes the evidentiary value of this evidence because he claims the prosecution did not establish he had been in possession of that phone at that time and place.

As William has not established that Perkins's testimony was physically impossible or inherently improbable, Perkins's testimony was sufficient to establish his identity. (Evid. Code, § 411.) The evidence was sufficient to support William's convictions on these counts.

C. Counts 10 and 11: Berto and Yang Robberies

Pringle's grandmother rented a black Infiniti SUV for Pringle to drive, and the next day a black Infiniti SUV was used to rob Berto. Fifteen minutes after Berto was robbed of his $50,000 Rolex Sky Dweller watch, William took a photograph of himself wearing a watch that looked exactly like it.

Evidence was presented at trial permitting the inference that approximately two weeks later, the Infiniti rented by Pringle's grandmother was used in the Yang robbery before being involved in a car accident and losing its license plate. The following day William used his cell phone to try to sell Yang's watch. William admitted trying to sell Yang's watch but denied participating in the robbery, maintaining he was attempting to sell the watch for a friend who had died.

William claims the People never proved he was one of the masked assailants who robbed Berto and Yang, only that he was in possession of the stolen watches. Although possession of recently stolen property is not itself sufficient to support a conviction for robbery, " '[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt.' " (*Grimes*, *supra*, 1 Cal.5th at p. 731.) Here, the corroborating evidence is William's connection to the rented black Infiniti used to commit the robberies. The evidence presented at trial demonstrated that William regularly used vehicles rented by others to commit his crimes, and this Infiniti was rented by his girlfriend's grandmother. The evidence was sufficient to permit a reasonable jury to conclude that William committed the two robberies.

## VIII. *Scott: Denial of Motion to Bifurcate or Empanel a Separate Jury*

After Wesley's trial was severed from that of his co-defendants, Scott moved to bifurcate the trial, or, alternatively, to seat a second jury to decide his guilt separately from William's or to try the counts involving Scott before those involving William. The prosecutor opposed bifurcation because much of the evidence would be admissible against both defendants. The trial court denied Scott's motion.

On appeal, Scott does not contend the court's failure to bifurcate or employ separate juries was prejudicial error with respect to counts 9 and 12, the firearms charges against him. This leaves counts 1 and 2, the Smith murder and Bay attempted murder in which both Scott and William were charged. With

respect to these counts, Scott acknowledges this was a "classic case" for a joint trial, as he and William were charged jointly with having committed common crimes involving common events and common victims. He does not allege the failure to order a separate trial on these counts was error. Instead, Scott contends the court should have tried the counts involving him before the rest of the charges against William, or else it should have ordered a second jury. Scott was found not guilty on count 2, so the only issue remaining on appeal pertains to count 1.

Section 1098 states in pertinent part that "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, *they must be tried jointly, unless the court order separate trials*. (Italics added.) This law thus establishes a legislative preference for joint trials, subject to a trial court's broad discretion to order severance." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079.) Offenses that are either "connected together in their commission" or "of the same class of crimes" should be tried jointly unless a defendant makes "a clear showing of potential prejudice." (*People v. Jones* (2013) 57 Cal.4th 899, 925.) In assessing potential prejudice, courts consider whether: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain charges are unusually likely to inflame the jury against the defendant; (3) one of the cases is sufficiently weak that there is a danger of a spillover effect of aggregate evidence on several charges; and (4) whether the matter is a capital case. (*Ibid*.)

71

Separate juries for jointly tried defendants are an alternative to outright severance. (*Thompson, supra,* 1 Cal.5th at p. 1085.) " '[T]he decision to use dual juries is largely a discretionary one, and . . . "[w]hen the trial court's denial of severance and impanelment of dual juries is urged as error on appeal . . . the error is not a basis for reversal of the judgment in the absence of identifiable prejudice or 'gross unfairness . . . such as to deprive the defendant of a fair trial or due process of law.' " ' " (*Id.* at pp. 1085–1086.)

Scott argues he was prejudiced by the joint trial. He claims he was "dirtied up" by being tried jointly with William, characterizing the evidence on the Smith murder as weak but the evidence against William on other counts as stronger. He points out he "sat through weeks of a trial where his codefendant was tried for murder, attempted murder, and robberies that took up far more time than the trial on the charges involving appellant and where the evidence was far stronger." Given the "ugly picture" the prosecution painted of William, Scott contends "[t]here is little possibility that the single jury hearing all of these charges together did not become prejudiced against appellant due to the mountain of evidence and charges against William." Complaining of a "spillover effect" of the evidence of the other crimes, Scott argues that if the jury hearing counts 1 and 2 (the Smith murder and Bay attempted murder) had not heard the evidence on the other murder and robbery charges involving William, he would have achieved a better result on the Smith murder count.

Scott has not identified prejudice or gross unfairness from the joint trial such as to deprive him of a fair trial or due process. The offenses with which William was charged were more numerous, but not more serious, than the special circumstances first degree murder alleged against Scott and William together. Some amount of the evidence was cross-admissible, specifically William's use of a rental car to commit the Smith murder as well as other crimes, and the evidence relating to the gang special circumstance and gang enhancement allegations. The cases were not capital cases. The evidence of William's other crimes, including another murder and multiple robberies, was not particularly inflammatory or likely to prejudice the jury against Scott when compared with the evidence against Scott: The jury was going to see and hear evidence of Scott's callousness regarding the Smith murder because Scott had recorded a video rapping about the murder in which he proudly bragged "I did that," dubbed himself "Hitman," said he "whack[ed]" members of a rival gang every time he saw them, and said he wanted his victim's brain. (Smith was shot in the head.) Scott also searched for media coverage of Smith's murder and saved a news story about the murder as souvenir.

Scott argues the evidence of William's other crimes was stronger than the evidence of the Smith murder, but that is hardly the case. Scott and William were identified by their accomplice Gabb as the other participants in the murder; there were photographs of them in the vehicle used to commit the murder; cell tower evidence placed Scott's phone at the scene of the shooting; and Scott recorded himself boasting about shooting Smith with lyrics that contained details of the shooting. Scott has not demonstrated any error.

73

## IX.   *Wesley:  Ineffective Assistance of Counsel*

"A defendant seeking relief on the basis of ineffective assistance of counsel must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Price* (1991) 1 Cal.4th 324, 386 (*Price*).)  Wesley argues his trial counsel's failure to move to suppress Davis's identifications of Wesley and William "based on the unfairly suggestive procedures used and the dearth of other circumstances indicating reliability of the identifications" constituted ineffective assistance of counsel.  Wesley argues this issue is properly raised on appeal since there could be no reasonable tactical or strategic reason for not directly challenging the admissibility of the identifications based on an allegedly suggestive identification procedure.  (See *Ray*, *supra*, 13 Cal.4th at p. 349 [to prevail on an ineffectiveness claim on direct appeal, "the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission"].)

To determine whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, a trial court must determine whether the identification procedure was unduly suggestive and unnecessary, and, if so, whether the identification was nonetheless reliable under the totality of the circumstances.  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942.)

The "defendant has the burden of showing that the identification procedure was unduly suggestive and unfair 'as a demonstrable reality, not just speculation.' " (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.)  Wesley's argument about unfair procedures boils down to an inference that because Davis did not

74

identify Wesley from a photographic lineup on September 29, 2015, and he did identify Wesley at the preliminary hearing in 2017, at some point law enforcement must have done something unfairly suggestive to prompt Davis to identify Wesley. Wesley acknowledged in the trial court that he had no evidence to support this theory: "I have no idea what was said in that car, none whatsoever. I don't know if Junior Davis was influenced, whether he looked at things and said, you know, that doesn't look like the guy. And then they showed him. Oh, that's the guy. I don't know." Wesley also describes the trial testimony that Davis focused on a photograph other than Wesley's when he looked at the lineup on September 29, 2015, and he stated that the other person looked either similar to the driver or similar to someone involved in the offense. He claims the "powerful if not overwhelming inference" from this evidence is that law enforcement engaged in impermissibly suggestive tactics to obtain Davis's later identification of Wesley, but this is speculation.

In light of the absence of evidence to support Wesley's claim of suggestive identification procedures, reasonably competent counsel could reasonably have concluded that it was futile to seek to suppress the identifications. Counsel does not render ineffective assistance of counsel by failing to make motions he or she reasonably determines to be futile. (*Price*, *supra*, 1 Cal.4th at p. 387.) Because the record does not demonstrate the absence of any rational tactical purpose for the failure to move to suppress Davis's identifications, Wesley's claim must be denied on direct appeal. (*Ray*, *supra*, 13 Cal.4th at p. 349.)

X.    *Wesley:  Sufficiency of the Evidence to Support*
      *Special Circumstances Finding on Count 4*

Wesley was convicted of the first degree murder of Foxworth, with the special circumstance found true that the murder was committed in the course of a robbery.  He contends the special circumstance finding must be vacated because the evidence was insufficient to support a finding that he acted with reckless indifference to human life.

" '[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'  [Citation.]  ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." '  [Citation.]  A reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  [Citation.]  '[A]n appellate court may not substitute its judgment for that of the jury.  If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding.'  [Citation.]  We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency.  [Citation.]  Rather, before we can set aside a judgment of conviction for insufficiency of the evidence, 'it must clearly appear that upon no hypothesis whatever is there sufficient evidence to

76

support [the jury's finding].' " (*People v. Garcia* (2020) 46 Cal.App.5th 123, 144–145 (*Garcia*).)

A defendant acts with reckless indifference to human life when he or she " ' "knowingly engag[es] in criminal activities known to carry a grave risk of death." ' " (*People v. Banks* (2015) 61 Cal.4th 788, 801.) "Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

"Determining a defendant's culpability under the special circumstances statute requires a fact-intensive, individualized inquiry." (*Scoggins, supra*, 9 Cal.5th at p. 683.) In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court identified factors to consider when assessing a jury's finding a defendant acted with reckless indifference to human life: (1) whether the defendant knew weapons would be used during the felony and/or used weapons during the felony;

77

(2) whether the defendant was physically present at the crime and had opportunities to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of his or her cohort's likelihood of killing; and (5) the defendant's efforts to minimize the risks of violence during the felony. (*Id.* at pp. 618–623; see also *Scoggins*, at p. 677.) None of these factors is necessary, nor is any one of them necessarily sufficient, to demonstrate a person acted with reckless indifference. (*Clark*, at p. 618.)

We analyze the totality of the circumstances to determine whether Wesley acted with reckless indifference to human life. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) With respect to the first *Clark* factor, whether the defendant knew weapons would be used during the felony and/or used weapons during the felony, Wesley notes that the evidence was that this was a classic drug rip-off. From this, and from the fact that the men struggled with Foxworth before William shot him, Wesley posits that the crime had been planned as a "nonlethal theft," and that therefore he could not be found to have acted with reckless indifference unless he knew at the outset that William was armed with a firearm. As Wesley notes, there was no evidence that he knew at the outset that William was armed, but that is not dispositive. In laying out the relevant factors for reckless indifference, the California Supreme Court has clearly stated that no single factor is necessary, nor is any single factor necessarily sufficient, to demonstrate a person acted with reckless indifference. (*Clark*, *supra*, 63 Cal.4th at p. 618.)

On the second *Clark* factor, evidence of Wesley's presence at the murder supported a finding he acted with reckless indifference to human life. "Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps. . . . In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark*, *supra*, 63 Cal.4th at p. 619; see *Garcia*, *supra*, 46 Cal.App.5th at p. 148 ["Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry"].) Wesley was present at the scene of the murder and actively involved in every step except the actual shooting—a fact tending to establish that although he was not the actual killer, Wesley shared in his co-participant's actions and mental state. (*Clark*, *supra*, at p. 619.) When Foxworth resisted handing over the money without receiving the drugs in return, Wesley had a choice. He could have chosen not to engage with Foxworth and to tell his brother to let Foxworth go. As Wesley was the driver of the car and sped off immediately after the shooting, it is a reasonable inference that Wesley could have ended the interaction by driving off when Foxworth proved not to be an easy mark. But Wesley chose to create danger to Foxworth by fighting with him, preventing him from getting away, and pulling him back into the car. Until just moments before William shot Foxworth, Wesley was engaged in a violent physical struggle

79

with Foxworth that resulted in his DNA being left under Foxworth's fingernails. Wesley's own personal conduct dramatically increased the danger to Foxworth.

There was also no evidence suggesting Wesley attempted to restrain his co-participant's conduct or to aid Foxworth. (*Garcia*, *supra*, 46 Cal.App.5th at p. 148 [substantial evidence supported robbery-murder special-circumstance finding where defendant "did not restrain the actions of his accomplices or check on the condition of his victims"].) Wesley was not interceding to restrain William. He was actively struggling with Foxworth and preventing Foxworth's escape. Nor did Wesley make any attempt to aid Foxworth or to summon aid for him after William shot him. Instead, Wesley hurriedly drove away, demonstrating he prioritized avoiding detection above Foxworth's life.

The third *Clark* factor is "[t]he duration of the interaction between victims and perpetrators," which is significant because a longer duration of interaction increases the likelihood the victim will be harmed. (*Clark*, *supra*, 63 Cal.4th at p. 620.) While there was no evidence that the incident took a particularly long time, the evidence did show that instead of abandoning the robbery plan when Foxworth resisted initial efforts to take his money, Wesley turned to violence: He engaged in a physical fight with Foxworth, grabbed at him and pulled him into the car, and prevented Foxworth from extricating himself, deliberately prolonging the incident and thereby heightening the danger to Foxworth.

The fourth *Clark* factor is whether the defendant had "knowledge of factors bearing on a cohort's likelihood of killing." (*Clark*, *supra*, 63 Cal.4th at p. 621.) No evidence was introduced at trial on this factor.

80

The final *Clark* factor considers whether the defendant undertook "apparent efforts to minimize the risks of violence." (*Clark*, *supra*, 63 Cal.4th at pp. 621–622.)  As we have already discussed, the record demonstrates that Wesley escalated the risk of violence in this case by engaging in a physical altercation with Foxworth and pulling him into the vehicle, personally increasing the risk to Foxworth by preventing his escape and forcing him into a confined space.

Wesley argues he only "contemplated a nonviolent theft of funds from a putative purchaser of drugs.  There might be a struggle but if so the perpetrators would flee (as occurred here) with no prospect of deadly force."  But as discussed above, Wesley's conduct was not consistent with a nonviolent theft of funds and flight if they encountered physical resistance.  Considering all the factors, we conclude the evidence permitted a reasonable jury to conclude beyond a reasonable doubt that Wesley acted with reckless indifference to human life.

XI.  ***All Appellants:  Issues Relating to Amendments to Section 186.22***

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)  Effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) amended section 186.22 to require proof of additional elements to establish a gang enhancement.  (Assem. Bill 333, § 3, amended § 186.22, eff. Jan. 1, 2022; Stats. 2021, ch. 699, §§ 1–4.) This court asked the People, and the appellants if the provision impacted their appeals, to file

supplemental briefing regarding the effect of newly enacted Assembly Bill 333.

We received and have considered supplemental briefing from William, Scott, and the People, all of whom agree, as do we, that appellants are entitled to the ameliorative effects of Assembly Bill 333's amendments to section 186.22 because their judgments were not final when the new legislation took effect. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343 (*Lopez*).)  We also agree with the parties that the amendments to section 186.22 require that this matter be remanded to the trial court for the People to have an opportunity to retry the allegations affected by these statutory changes.

A.     Assembly Bill 333's Statutory Changes

A " 'criminal street gang' " was formerly defined in section 186.22 as "an *ongoing organization, association, or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, former subd. (f), italics added.)  Effective January 1, 2022, Assembly Bill 333 narrowed the definition of " 'criminal street gang' " to "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, subd. (f), italics added.)

82

"Assembly Bill 333 also altered the requirements for proving the 'pattern of criminal gang activity' necessary to establish the existence of a criminal street gang. [Formerly], a 'pattern of criminal gang activity' mean[t] 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more [persons].' (§ 186.22, subd. (e).) As of the effective date, Assembly Bill 333 redefine[d] 'pattern of criminal gang activity' to require that the last of the predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' (Assem. Bill 333, § 3; amended § 186.22, subd. (e)(1), eff. Jan. 1, 2022.) In addition, the currently charged offense cannot be used as a predicate offense under the amendments. (*Id*., subd. (e)(2).)" (*Lopez*, *supra*, 73 Cal.App.5th at p. 345.)

"Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22. Here, two other statutes that refer specifically to section 186.22 are implicated: section 190.2, subdivision (a)(22) and section 12022.53, subdivision (e)(1). Section 190.2, subdivision (a)(22) establishes a gang murder special circumstance: 'The

83

defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang.' " (*Lopez*, *supra*, 73 Cal.App.5th at pp. 346–347.)

"Section 12022.53 provides for sentence enhancements for the use of firearms in the commission of an enumerated felony. The statute first provides for escalating punishments depending on how the firearm is used. The least severe penalty is set forth in section 12022.53, subdivision (b), which provides for a consecutive 10-year term for a defendant who 'personally uses' a firearm in a felony. Next, a consecutive 20-year term is imposed under section 12022.53, subdivision (c), if the defendant 'personally and intentionally discharges a firearm' in the commission of the offense. Finally, section 12022.53, subdivision (d) provides for a consecutive sentence enhancement of 25 years to life when the defendant 'personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death' during the commission of the offense.

"While these subdivisions provide punishment for offenders who personally use a firearm during the commission of their crimes, the penalties may also be imposed on any person who is a principal in the offense under certain gang-related circumstances: First, the person who is a principal must be 'convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members' as set forth in section 186.22, subdivision (b). (See § 12022.53, subd. (e)(1)(A).) Second, '[a]ny principal in the offense' must have 'committed any act specified in subdivision (b), (c), or (d),' that is,

any principal involved in the offense must have personally used a firearm in the escalating use categories provided in section 12022.53, subdivisions (b) through (d).  (§ 12022.53, subd. (e)(1)(B).)"  (*Lopez*, *supra*, 73 Cal.App.5th at p. 347.)

B.    Impact of Assembly Bill 333

William and Scott contend, and the People agree, that in light of the statutory changes of Assembly Bill 333, the enhancement findings under section 186.22, subdivision (b) and the gang special circumstances findings under section 190.2, subdivision (a)(22) must be vacated and the matter remanded to afford the prosecution an opportunity to retry the gang special circumstance and enhancements to meet its burden of proof under the amendments to section 186.22.  We agree with the parties.  As the definition of a criminal street gang has been narrowed by Assembly Bill 333 and new elements added in order to prove a criminal street gang and a pattern of criminal activity, both the gang enhancement allegations and the special circumstances findings under section 190.2, subdivision (a)(22) must be vacated; on remand, the People must be afforded the opportunity to prove the gang enhancements and the gang special circumstance in compliance with the amended section 186.22.  (*Lopez*, *supra*, 73 Cal.App.5th at p. 347.)

Although the parties did not address this in their briefing, the amendments to section 186.22 also affect the gang-related firearm enhancements imposed under section 12022.53, subdivision (e)(1).  "Because this enhancement depends on a finding that the principal was 'convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members' as set forth in

85

section 186.22, subdivision (b) (see § 12022.53, subd. (e)(1)(A)), the changes to section 186.22 made by Assembly Bill 333 require that the true findings on these enhancements, too, be vacated and the matter remanded to the trial court." (*Lopez, supra,* 73 Cal.App.5th at pp. 347–348.)

Accordingly, as to Scott, on count 1, the jury's findings on the section 190.2, subdivision (a)(22) gang special circumstance and the section 186.22, subdivision (b)(1)(C) must be vacated.

As to William, the section 190.2, subdivision (a)(22) gang special circumstance finding on count 1 must be vacated; the section 186.22, subdivision (b)(1)(C) enhancement findings on counts 1, 4, 6, 7, 10, and 11[12] must be vacated; the section 186.22,

---

[12] William and the People agree that the impact of Assembly Bill 333 is moot with respect to the gang enhancement findings under section 186.22, subdivision (b)(1)(C) on counts 10 and 11 because the trial court struck the gang enhancement on those counts, but we disagree. The trial court struck the gang enhancement on those counts at sentencing because it had imposed a firearm enhancement under section 12022.53, subdivisions (b) and (e)(1), and the court was prohibited by section 12022.53, subdivision (e)(2) from imposing the gang enhancement in combination with that firearm enhancement. Section 12022.53, subdivision (e)(2) provides, "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, *unless the person personally used or personally discharged a firearm in the commission of the offense*." (Italics added.) As discussed above, section 12022.53, subdivision (e)(1) enhancements do not require the defendant to personally use or discharge a firearm; they apply to any person who is a principal in the commission of an offense if (1) the person violated section 186.22, subdivision (b) *and* (2) any principal in the offense personally used and/or discharged a firearm as specified in

86

subdivision (b)(1)(A) enhancement findings on counts 5, 8, 13, and 14 must be vacated; and the sentence enhancements imposed under section 12022.53, subdivision (e)(1) on counts 1, 10, and 11 must be vacated.  We note that the amendments to section 186.22 do not disturb the true findings on William's enhancement allegations for *personal* use and/or discharge of a firearm under section 12022.53, subdivisions (b), (c), and (d).

Although Wesley did not submit supplemental briefing, we nonetheless consider his sentence on appeal because, given the ameliorative changes in the law, his sentence is now unauthorized; that is, the trial court imposed a sentence that now could not be lawfully imposed in that case.  (See *People v. Anderson* (2020) 9 Cal.5th 946, 962.)  As to Wesley, on counts 4 and 15, the findings on the section 186.22, subdivision (b)(1)(C) enhancements and on the section 12022.53, subdivision (e)(1) enhancements must be vacated.

Our conclusion that the section 190.2, subdivision (a)(22) gang special circumstance findings must be vacated makes it unnecessary to address Scott's claim that instructional error lowered the prosecution's burden of proof on that special circumstance.  Similarly, our determination that the gang enhancement findings must be vacated and the matter remanded

---

section 12022.53, subdivision (b), (c), or (d).  As the true findings on both the gang and firearm enhancements on these two counts must be vacated due to Assembly Bill 333, the statutory basis for the striking the gang enhancement at sentencing disappears, and we identify no impediment to the People retrying both enhancements.  Should these enhancement allegations be found true again after retrial, we are confident the trial court will apply section 12022.53, subdivision (e)(2) at resentencing.

moots William's argument that the evidence was insufficient to support the gang enhancement findings on counts 4, 5, 10, 11, 13, and 14. Finally, William's argument in his supplemental briefing that the sentences on counts 5, 8, 13, and 14 were unauthorized under *People v. Briceno* (2004) 34 Cal.4th 451 (defining "serious felony" section 1192.7, subdivision (c)(28) as including any felony offense committed for the benefit of a criminal street gang under section 186.22, section (b)(1)), has been mooted by our determination that the section 186.22, subdivision (b)(1)(A) findings must be vacated and the matter remanded to give the People the opportunity to retry the allegations. Should a *Briceno* issue arise when William is resentenced on those counts, he may raise the issue in the trial court at that time.

The matter must be remanded to the trial court, where the prosecution shall be afforded an opportunity to retry the gang special circumstance and gang-related enhancements to meet its burden of proof pursuant to Assembly Bill 333's new requirements.

## DISPOSITION

For each defendant, the gang enhancement allegation findings under section 186.22, the special circumstances findings under section 190.2, subdivision (a)(22), and the gang-related firearm enhancement findings under section 12022.53, subdivision (e)(1) are vacated. The matters are remanded to the trial court for retrial if the People so elect. In all other respects, the judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

HARUTUNIAN, J.*

---

*    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.